SMALLEY v. McGRAW.

1. TRIAL—DIRECTION OF VERDICT—PROPRIETY.

The direction of a verdict for defendant before the close of plaintiff's testimony cannot be sustained unless the testimony offered by plaintiff conclusively negatives his cause of action.

2. WITNESSES—CREDIBILITY—EXPLANATIONS OF TESTIMONY.

In an action against bank directors for damages sustained by the purchase of stock in their bank in reliance on reports as to its condition made by them to the comptroller of the currency it is error not to permit plaintiff's agent to explain his testimony from which an inference may be drawn that he did not rely upon the reports and to testify to the extent of his reliance thereon.

3. BANKS AND BANKING—OFFICERS—LIABILITY—FALSE REPORTS—PURCHASERS OF STOCK.

Where, in an action against bank directors for damages sustained by the purchase of stock in their bank in reliance on false reports as to its condition made by them to the comptroller of the currency, plaintiff's agent testifies that he did rely upon the reports, the questions of his knowledge of the making up and the contents of the reports, and of his reliance upon them, are questions for the jury and not for the court, though his testimony is open to the inference that he did not so rely.

4. SAME—REPORTS—PURPOSE.

The object of section 5211, U. S. Rev. Stat., in requiring reports on the condition of national banks, is to apprise the comptroller and the public of the condition of each national bank at stated periods, and a person contemplating the purchase of stock in a national bank has a legal right to rely upon the published report as a true statement of the financial condition of the bank, without further inquiry, in the absence of knowledge tending to show the unreliability of the statement.

5. SAME—KNOWLEDGE OF PURCHASER—DILIGENCE.

A prospective purchaser of bank stock, relying on the reports made by the directors to the comptroller of the currency, is not chargeable with knowledge of such circumstances affecting the reliability of the reports as he might discover by the

exercise of ordinary prudence and diligence, but only with the natural inferences deducible from the knowledge possessed by him.

6. SAME—LIABILITY OF DIRECTORS.

Where directors of a national bank signing a report to the comptroller of the currency knew, or by the exercise of ordinary diligence in the discharge of their duties would have known, prior to signing such report, that the item therein "Loans and Discounts" contained paper worth much less than its face value, which would materially affect the value of the stock of the bank, they are individually liable, under the common law, to a purchaser of the stock who relied in good faith upon such report as stating the true financial condition of the bank.

ON MOTION FOR REHEARING.

COURTS—DECISIONS—CONTROL BY OTHER COURTS—FEDERAL QUESTION—REHEARING—LAW OF THE CASE.

That the Supreme Court of the United States has decided a case involving the Federal question involved in the case at bar, and reached a different conclusion from that reached by this court, is not ground for a rehearing, where the Federal case, though decided before, was not published until after the State case was decided, and does not touch the principal grounds upon which the decision in the State case was made; but as to the Federal question involved, the Federal case will be considered to be the law of the State case in all further proceedings.

Error to Saginaw; Gage (William G.), J. Submitted April 4, 1907. (Docket No. 8.) Decided May 18, 1907. Rehearing denied July 13, 1907.

Case by Margaret A. Smalley against Joseph W. Mc-Graw and Frank P. Chesbrough for fraud and deceit. There was judgment for defendants on a verdict directed by the court, and plaintiff brings error. Reversed.

*Gillett & Clark* and *John C. Weadock*, for appellant.

*M. L. Courtright* and *Humphrey & Grant*, for appellee McGraw.

*T. A. E. Weadock*, for appellee Chesbrough.

Blair, J.    This is a common-law action for fraud and deceit against the defendants as directors of the Old Second National Bank of Bay City, based upon representations of the financial condition of the bank, contained in certain reports to the comptroller of the currency, in reliance upon which plaintiff alleges she purchased certain stock of the bank.

The declaration contained four counts.    The first count charged that, at the time of the fraudulent representations relied upon, the capital of the bank had become impaired and its value destroyed by reason of losses suffered by the bank through the discounting of paper for Alzina Maltby (doing business as the Maltby Lumber Company) and W. I. Brotherton & Co.; that defendants, as directors of the bank, fraudulently and knowingly caused and permitted Maltby and Brotherton paper of the face value of $375,000, which defendants knew to be worthless, to remain as an asset at its face value on the books of the bank, and to be listed as such in five reports to the comptroller of the currency, published during the year 1903; that this was done for the purpose of giving the stock a fictitious value in the eyes of the public; and that, for the same purpose, the defendants, as directors, declared and paid 5 per cent. semi-annual dividends during the years 1902 and 1903, thereby holding out and representing to the public that these dividends had been earned, and that the capital stock of the bank was unimpaired.    This count treats the keeping of false books, the publishing of false reports, and the declaration of unearned dividends as acts "performed by the said defendants acting jointly and in concert and in pursuance of one common purpose and design " to induce plaintiff and the public to deal with the bank, to buy its capital stock, and to give its stock a fictitious value in the market.    The other counts of the declaration merely separate the elements which in the first count are joined together.    The first count treats the keeping of false books, the publishing of false statements, and the fraudulent declaration of dividends as all part of one single scheme

of fraud. The second count is based only upon the keep-
ing of false books—failing to deduct from the apparent re-
sources of the bank, as shown by its books, so much of
the Maltby and Brotherton paper as was known by the
defendants to be worthless. The third count bases the
action on the publication of a single false report, that of
November 17, 1903, which was the last report published
before plaintiff bought her stock. The fourth count bases
the action upon the fraudulent declaration of dividends
at a time when defendants knew the capital stock to be
impaired, and with the knowledge and intent on their
part that the declaration of these dividends would be
accepted by the public as a representation that the capital
stock was unimpaired.

The stock was not bought from either of the defendants,
and the action is not based upon any privity between the
parties either as vendor and purchaser, or as director and
stockholder, but upon the duty owing to plaintiff as one
of the public. The only fraudulent representations sought
to be proved concerned certain paper known as the
"Maltby and Brotherton Paper," which was included at
its face value in the statement of "Loans and Discounts"
in the reports.

Plaintiff's counsel, at the outset, made a statement of
what they expected to prove, and, among other things,
that on the 30th day of June, 1902, the bank held $430,000
of drafts made by the Maltby Lumber Company upon its
customers and discounted at the bank; that at the same
time the bank held drafts discounted for W. I. Brother-
ton & Co., amounting to $85,000 to $100,000; that in-
vestigations were ordered in October, 1902, which showed
that:

"In this amount of drafts I have mentioned $430,000,
which was reduced to about $320,000 by the following
January; $135,000 worth were actually proved worthless,
of no value, and charged off to profit and loss on the
books of the bank. We also expect to show you of this
W. I. Brotherton & Co. paper (and I mean by that com-
mercial paper—this bank now have drafts and notes and

other paper discounted) the sum of $53,000 was prior to 1906 actually charged off the books of the bank to profit and loss, and as a result of this loss the capital stock of the bank has been cut in half, reduced from $200,000 to $100,000. We shall also show you that the bank is no doubt now carrying paper and notes yet representing this old Maltby account of $120,000, or thereabouts, which is still unpaid, and that all the bank has to show for that paper are assets in round numbers $25,000 to $20,000, so there is another loss of from $90,000 to $100,000 still to be charged off the books of the bank which has not been charged off. We expect to show you, gentlemen of the jury, that all of this enormous loss was actually suffered by the bank back in the years 1902 and 1903 before Mr. Woodworth bought his stock or Miss Smalley bought her stock. We expect to show you that the loss was suffered back then, and that these defendants, instead of charging it off at that time, carried along on the books of the bank a tremendous lot of worthless paper purporting and appearing to be assets of the bank, which were not assets, which were worth nothing, and which they knew to be worth nothing. And on the question of their knowledge we expect to show you that the facts at the hands of these men—facts which they had within their reach such that by the use of reasonable care they would have advised them—were sufficient to advise them, in the year 1902 and early in 1903, that these assets were worthless. * * * We expect to show you that the facts within the reach of these men were sufficient to give them a knowledge about these accounts and about the value of these assets, and give them a clear idea of what they were worth. And we expect to show you that the circumstances were such that with reasonable care they should have known the true condition of affairs, whether they knew it or not actually. We expect to show that, and prove that by the contents of the books of the bank, by the contents of the books of the Maltby Lumber Company, and by the contents of the books of the Maltby Cedar Company, which we shall show you was a corporation formed for the benefit of the Old Second National Bank in the year 1904, to take over and realize upon the assets of Alzina Maltby. We also expect to show you these men had actual knowledge."

After making his opening statement, plaintiff's counsel

called the cashier of the bank, and sought to examine him as to the books of the bank. Upon objection being made, the court ruled that the cashier could not be inquired of as to the books until some proof of misrepresentations on the part of defendants had been put in. Thereupon, counsel for plaintiff gave evidence tending to show the publication of several reports; the last of them being a report of November 17, 1903, which contained, under the head of "Resources," the item, "Loans and Discounts, $1,081,446.05," and that on December 16, 1903, plaintiff's agent, relying upon the published statements, puchased for plaintiff 10 shares of the stock of the bank from a broker. It was agreed by counsel that the published statement agreed with the books of the bank. In the course of the examination of plaintiff's agent, the following occurred:

"*Q.* In buying this Smalley stock, to what extent did you rely upon the published statement under date of November 17, 1903?

"*Mr. T. A. E. Weadock:* I object to that as incompetent, for he has already answered the question.

"*The Court:* Sustain the objection.  *  *  *

"*Q.* State whether you would have bought the plaintiff's stock on December 16, 1903, if you hadn't seen the published statement of November 17, 1903.

"*Mr. T. A. E. Weadock:* I object to that as leading.

"*The Court:* Sustain the objection.

"*Mr. J. C. Weadock:* Exception.

"*The Court:* As I understand, this man has been all over that. He has made the statement once, and he has come in here apparently to make it over again.

"*Mr. Clark:* Exception to that remark.

"*Mr. J. C. Weadock:* His statement was he relied upon this statement. Our purpose is to show it was an exclusive reliance.

"*Mr. Clark:* Not only that, but a reliance to the extent that he wouldn't have bought this stock without this statement.

"*The Court:* That's the way I understand it. I sustain the objection.  *  *  *

"*Q.* When you bought the plaintiff's stock, state what, if any, knowledge you had of the facts in regard to the

Maltby and Brotherton paper held by the Old Second National Bank, its amount, or its value.

" *A.* I had no knowledge whatever of how much Maltby or Brotherton paper they had.

" *Q.* What knowledge did you have in any way in regard to the value of such of the Maltby and Brotherton paper as they had ?

" *A.* I had no knowledge of the value of the paper.

" *Q.* What knowledge did you have as to what other paper was included in that statement of loans and discounts made by the bank ?

" *A.* I had no knowledge of any of the paper.

" *Q.* Or what it was worth ?

" *A.* None whatever. The plaintiff herself had nothing to do with the purchase of this stock outside of the signing of this check and giving it to me. * * *

" *Q.* You say in buying this stock you relied entirely upon the statements ?

" *A.* Yes; I did. * * *

" *Q.* What do you mean by the statement you made on cross-examination that you knew that all these bank statements in showing loans and discounts would show them regardless of their values ?

" *Mr. T. A. E. Weadock:* I object to that as incompetent cross-examination of his own witness.

" *The Court:* It's a question for the jury.

" *Mr. Clark:* Exception.

" *Q.* Did you understand the question asked by Mr. Weadock as I asked it to you in this question ?

" *Mr. T. A. E. Weadock:* Objected to as incompetent.

" *The Court:* Call the attention of the witness to the testimony, and then I will rule upon it. (Recess. Copy of question and answer furnished by stenographer.)

" *Q.* I call your attention to the question and answer. (Reading.) ' You knew that the statement in their reports meant the amount of loans and discounts held at the bank on that day regardless of their value ?

" ' *A.* Yes.' I ask you if you understood that question and intended to answer it that way ?

" *Mr. T. A. E. Weadock:* I object to that as incompetent, as utterly unwarranted.

" *The Court:* I sustain the objection. If you want to get at that matter, you will have to get at it in some different way.

" *Mr. Clark:* Exception. * * *

"*Mr. J. C. Weadock:* Mr. Woodworth has testified on the stand that he assumed and believed that statement contained a statement of the resources of the bank.  If there is any misapprehension upon the subject, we desire to clear up the testimony, and put Mr. Woodworth back on the stand.  We don't want this court to assume Mr. Woodworth has said he knew there was in that report any loans and discounts which were bad.

"*The Court:* He did say so as plainly as the English language or any other language can convey it.

"*Mr. Clark:* Exception to that statement.  *  *  *

"*Mr. Clark:* Will the court rule upon our offer to place Mr. Woodworth again upon the stand ?

"*The Court:* After this motion is made.  I understand there is a motion to take this case from the jury.

"*Mr. T. A. E. Weadock:* Exactly.

"*Mr. Clark:* We say our case isn't completed, and Mr. Woodworth's testimony is not completed.

"*The Court:* You withdrew Mr. Woodworth, and said he was excused, and you certainly knew the court told you you must make your principal case by Mr. Woodworth in the first place before you put any other testimony upon the stand, and then you called Mr. Andrews and other witnesses after excusing Mr. Woodworth.

"*Mr. Clark:* After we had attempted to get from Mr. Woodworth an explanation, and your honor had prevented us from doing it.  Now, we again ask the privilege of making that explanation.

"*Mr. T. A. E. Weadock:* When the plaintiff himself made the statement his case was gone, and you knew it.

"*Mr. Clark:* I believe it is for the jury to say whether—

"*The Court:* Gentlemen of the jury—

"*Mr. J. C. Weadock:* We haven't completed our testimony, and we desire to make our record complete—

"*Mr. T. A. E. Weadock:* No.

"*Mr. J. C. Weadock:* Then we want to have on the record what we propose to show or prove:

"*The Court:* That is entirely proper."

Plaintiff's counsel thereupon offered in evidence certain depositions, and made an offer to prove, extending over several pages of the record, covering the opening statement of her case in detail, and with some additional mat-

ter. In the course of the statement, the following occurred:

"Plaintiff's agent in buying plaintiff's stock relied upon the published statement of November 17, 1903, and would not have purchased this stock if he had not seen this statement, and if it had not been shown that the stock had increased in value since the previous statement.

"*The Court:* You cannot show anything further on that subject. You have already gone into that.

"*Mr. Clark:* We didn't show it.

"*The Court:* I said if you asked it in a proper way you could ask the direct question, or without questioning let him explain what he meant by his statement.

"*Mr. Clark:* I will repeat that this offer is made, as I said in the beginning, in addition to the proofs already made."

At the conclusion of the statement, the following occurred:

"*Mr. T. A. E. Weadock:* We object to that as incompetent, irrelevant, and immaterial. And I desire to say that if these gentlemen have any proof that either of these defendants at any time, or in any way, made any false representations, let them produce the proof of it. We say they are making a statement which consists of mere words which we know they cannot prove. They have no proof of that sort. If they have, we will listen to it. But so far as the whole case goes, the statement that is made here, I object to it as incompetent, irrelevant, and immaterial, except so far perhaps as it charges them with direct fraud of which they have no evidence and can produce none. There is testimony enough here which, as the proof stands in this, would preclude the plaintiff from recovering. I say, further, that the offer, in the shape it is made, is entirely incompetent. No court can be called to rule upon such a statement as that.

"*The Court:* I sustain the objection to it.

"*Mr. Clark:* Exception."

Thereupon the court directed a verdict for defendants, stating, among other things, the following:

"Now, from the testimony already given in this case by Mr. Woodworth, who here stands in the place and stead of the plaintiff, Miss Smalley, I am satisfied that

the plaintiff *cannot recover in this case in any event, for the reason that he was not deceived by this statement.* His testimony in this case indicates that he knew these statements did not show the true condition of the affairs of the bank, that they might include bad paper as well as good, that they might include suspended paper as well as good, and, in fact, that it might include a large amount of bad paper, and part of this testimony I will now quote. In regard to this he says in answer to a question, as follows (quoting testimony):   *   *   *   Now, gentlemen, *in my view of this case the evidence is so strong that it is impossible to meet it,* that the plaintiff in this case through her agent, Mr. Woodworth, had full knowledge of the manner in which these bank statements were made out, and could not charge these people with fraud because of having been deceived by a statement of that kind, which he knew was utterly unreliable according to his own statement. He was put upon inquiry, and was bound to go further and ascertain more before he could rely upon that statement. He was not warranted in relying upon that statement, and then seek to hold these defendants for any loss which he might suffer or which might have been suffered thereby. I therefore instruct you, gentlemen of the jury, to render a verdict in this case of not guilty."

The judgment in this case cannot be sustained, unless the court was correct in his conclusion that the testimony of plaintiff's agent conclusively negatived her cause of action. *Field* v. *Clippert,* 78 Mich. 26. We are of the opinion that the court erred in excluding answers to the questions calling for explanations of the agent's testimony and as to the extent of his reliance upon the reports. We are also of the opinion that it did not appear from the testimony of plaintiff's agent, as a matter of law, that he had no right to rely, and did not rely, upon the reports to the comptroller. He testified that he did rely upon the reports, and, although the inference that he did not might be deduced therefrom, his testimony, considered as a whole, would have authorized a finding that he did rely upon the reports. The questions of his knowledge of the making up and contents of the reports, and of his reliance upon them, were, at the most, questions for the jury, and

not for the court.  He testified that he had no knowledge of any of the paper included in the item "Loans and Discounts," or of its value.  We do not think it conclusively appears, as stated by the court, that the agent had full knowledge of the way these reports were made out, and that they were so utterly unreliable that he was bound to go further and ascertain more before he could rely upon the reports.  The diligence required of the plaintiff's agent must be considered in connection with the character of the representations upon which he claimed to rely.  The reports were published in accordance with the provisions of section 5211 of the Revised Statutes of the United States, containing a provision that "each such report shall exhibit, in detail and under appropriate heads, the resources and liabilities of the association at the close of business on any past day by him specified."  The object of this section, as said by the Supreme Court of the United States, "was to apprise the comptroller of the currency *and the public* of the condition of each national bank at stated periods."  *Cochran* v. *U. S.*, 157 U. S. 286, 296.  We think it necessarily follows that a person contemplating the purchase of stock of the bank has a legal right to rely upon the published report as a true statement of the financial condition of the bank, without further inquiry, in the absence of knowledge tending to show the unreliability of the statement.  2 Cook on Corporations (5th Ed.), § 352.  The prospective purchaser is not chargeable with knowledge of such circumstances as he might have discovered by the exercise of ordinary prudence and diligence, but only with the natural inferences deducible from the knowledge possessed by him.  *Smith* v. *McDonald*, 139 Mich. 225; *Sawyer* v. *Building Ass'n*, 103 Mich. 228.  There is some confusion in the testimony of the agent due to the fact he was cross-examined at length with reference to knowledge acquired and conduct on his part after the purchase of the stock, which could only be competent as bearing upon the credibility of his testimony, and would not be competent as admissions or

proof of facts against the plaintiff. *Hall* v. *Murdock,* 119 Mich. 389.

In view of another trial, we consider it proper to express our views as to certain of the questions argued in the briefs of counsel.

"It is the settled rule in this State, whatever the rule may be elsewhere, that one who purchases property in the belief of, and reliance upon, false statements regarding it, may sue for and recover the damages occasioned thereby, whether the representations are made in good or bad faith." *Krause* v. *Cook,* 144 Mich. 365.

Directors of a bank are bound to exercise that degree of care in the business affairs of the bank that ordinarily prudent and careful men would exercise in affairs of like importance. *Briggs* v. *Spaulding,* 141 U. S. 132; *Commercial Bank of Bay City* v. *Chatfield,* 121 Mich. 641; *Gibbons* v. *Anderson,* 80 Fed. 345. The liability of the directors in a case like this is independent of the national banking act, and is derived from the principles of the common law. *Prescott* v. *Haughey,* 65 Fed. 653; *Brinckerhoff* v. *Bostwick,* 88 N. Y. 52; *Yates* v. *Jones Nat. Bank* (Neb.), 105 N. W. 287. If the directors signing the report knew, or by the exercise of ordinary diligence in the discharge of their duties would have known, prior to signing such report, that the item "Loans and Discounts" contained paper worth much less than its face value, which would materially affect the value of its stock, they would be individually liable to a purchaser of the stock who relied in good faith upon such report as stating the true financial condition of the bank. *Prewitt* v. *Trimble,* 92 Ky. 176; *Heard* v. *Pictorial Press,* 182 Mass. 530; *Hubbard* v. *Weare,* 79 Iowa, 678.

The judgment is reversed, and a new trial granted.

GRANT, MONTGOMERY, HOOKER, and MOORE, JJ., concurred.

### ON MOTION FOR REHEARING.

PER CURIAM. A motion for rehearing has been made

in this case based upon the recent decision of the Federal Supreme Court in the case of *Yates* v. *Jones Nat. Bank,* 206 U. S. 158. The Federal case, although decided five days earlier, had not been published at the time of our decision. We do not think any useful purpose would be served by granting a rehearing because of the decision referred to. The case does not touch the principal grounds upon which the case before us was reversed. It does establish a different test of the liability of directors of a national bank for participating in alleged false official reports to the comptroller of the currency from that adopted by this court, and as such test must be considered to be the law of the case in all further proceedings.

Application denied.