CHESBROUGH et al. v. WOODWORTH.

(Circuit Court of Appeals, Sixth Circuit. March 5, 1912. **On Motion to** Modify, April 5, 1912.)

No. 2,151.

1. BANKS AND BANKING (§ 253*)—NATIONAL BANKS—LIABILITY OF OFFICERS AND DIRECTORS.

The making and publishing by a national bank of the reports required by statute are not merely for the information of the comptroller, but are to guide so much of the public as may have occasion to act thereon, and one who buys from another stock in the bank in reliance upon a false report of its condition, and suffers damage thereby has a right of action against any officer or director who, knowing its falsity, authorizes such report, under Rev. St. § 5239 (U. S. Comp. St. 1901, p. 3515), which makes them individually liable for damages sustained by the association, its stockholders, "or any other person."

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 944–949; Dec. Dig. § 253.*]

2. BANKS AND BANKING (§ 254*)—NATIONAL BANKS—ACTION FOR DAMAGES AGAINST OFFICER OR DIRECTOR.

The damages in such a case are personal with plaintiff who sues in his own individual right, and not in that of the association.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 950–957; Dec. Dig. § 254.*]

3. BANKS AND BANKING (§ 254*)—NATIONAL BANKS—ACTION AGAINST DIRECTORS—ISSUES AND PROOF.

Such an action against directors involves no direct issue of negligence, the sole primary issue being whether a defendant caused or permitted to be made a statement of the bank's condition on which plaintiff relied to his injury, and which statement defendant knew was materially false. The liability of the directors is several, and plaintiff may sue one or more, but must make out a sufficient case against each one to authorize a recovery against him, and, in general, the detailed history of the entire transaction and of each defendant's connection with the same is admissible.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 950–957; Dec. Dig. § 254.*]

4. BANKS AND BANKING (§ 253*)—NATIONAL BANKS—ACTION AGAINST DIRECTORS—MAKING FALSE STATEMENTS.

In such an action, where the falsity of the statement consisted in its including as resources in the loans and discounts paper to a large amount which was worthless, the making and publishing of the statement, which under the general custom are merely the automatic result of the bookkeeping, do not constitute the underlying wrong, and any director who participated in or approved the continued carrying on the books of such paper as assets at its face value to an amount sufficient to affect the standing of the bank and knowing its worthlessness is bound to know that under the prevailing practice the statements will be substantially false, and is responsible therefor.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 944–949; Dec. Dig. § 253.*]

5. BANKS AND BANKING (§ 253*)—NATIONAL BANKS—LIABILITY OF DIRECTORS.

While the duty of charging off such worthless paper is that of the board of directors as an entity, and in such matter it has a reasonable discretion, when the duty exists and is wholly unperformed, an individual director who is engaged generally in the performance of his functions may

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

be personally liable because of his participation in the failure to act by failing to make reasonable personal efforts to induce the proper action.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 944-949; Dec. Dig. § 253.*

Personal liability of directors of bank, see note to Robinson v. Hall, 12 C. C. A. 680; Warner v. Penoyer, 33 C. C. A. 230.]

6. BANKS AND BANKING (§ 254*)—ACTION AGAINST DIRECTORS—EVIDENCE.

An action against directors of a national bank to recover damages sustained by plaintiff because of the making and publication by the bank of statements including as assets a large amount in worthless notes, in reliance on which statements plaintiff purchased stock at more than its actual value, is not supported by evidence that such notes were for loans to the maker in excess of the 10 per cent. permitted by Rev. St. § 5200 (U. S. Comp. St. 1901, p. 3494), since that fact does not affect their collectibility, but evidence to show motive, as that defendants were themselves selling their stock at a high price, is. material.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 950-957; Dec. Dig. § 254.*]

7. EVIDENCE (§ 215*)—NATIONAL BANKS—ACTION AGAINST DIRECTORS—EVIDENCE.

In such an action, the fact that plaintiff subsequently became a director and joined in attesting statements which included as assets some of the same paper was admissible as in the nature of an admission that such paper was not so clearly worthless as to make defendants' acts unlawful; its weight being for the jury.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 754-759; Dec. Dig. § 215.*]

8. BANKS AND BANKING (§ 254*)—NATIONAL BANKS—ACTION AGAINST DIRECTORS—MEASURE OF DAMAGES.

The general rule of damages in actions of deceit that one induced by false representations to purchase property at more than its value is entitled to recover the difference between what the property was actually worth and what it would have been worth if the representations had been true, not exceeding the sum paid, is not applicable to an action against directors of a national bank under Rev. St. § 5239 (U. S. Comp. St. 1901, p. 3515), by one who purchased stock of the bank in reliance on published statements of its condition which were false, in that they included as assets in the loans and discounts a large amount of worthless paper; since, under such section, defendants are liable only for knowing violations of the law. In such case the measure of plaintiff's recovery is the difference in the fair market value of his stock if all the paper had been of a character entitling it to be reported as assets, and that sum which would have been its fair market value if the directors, in the exercise of due care and good faith, had charged off the books, and not reported so much of the paper as they knew or had good reason to believe was uncollectible, assuming that defendants participated in or assented to such nonaction.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 1004; Dec. Dig. § 254.*]

On Motion to Modify.

9. APPEAL AND ERROR (§ 1140*)—DISPOSITION OF CAUSE—AFFIRMANCE ON REMISSION OF PART OF RECOVERY.

It is a good practice in a proper case to permit a plaintiff to enter a remittitur, and as so modified to affirm a judgment in his favor, which must otherwise be reversed for error occurring at the trial, but such practice can only be followed where it appears from the record that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

certain elements of the verdict might have been affected by the error, and that the remainder of the verdict could not have been so affected.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4462–4478; Dec. Dig. § 1140.*]

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

Action at law by Frank T. Woodworth against Frank P. Chesbrough and Joseph W. McGraw. Judgment for plaintiff, and defendants bring error. Reversed.

Thomas A. E. Weadock, for plaintiff in error Chesbrough.

Morris L. Courtright, for plaintiff in error McGraw.

E. S. Clark and J. C. Weadock (Gillett & Clark, on the brief), for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. In October, 1902, the Old Second National Bank, of Bay City, Mich., reported a capital of $200,000, a surplus of $75,000, and undivided profits of $27,000. Its total loans and discounts were about $1,000,000. Alvin Maltby, who some years before had been involved in a failure, was in 1902 doing business for his wife, but using the trade name. "Maltby Lumber Company," and under that name was dealing in telegraph poles, railroad ties, etc. The Maltby Company had followed the plan of shipping a car, making a draft on its customer, attaching a bill of lading and inspection certificate to draft, and discounting the draft at this bank. The railroad and telegraph companies had long been following their general rule in refusing to accept such drafts, but paying the accounts in their regular course. The so-called discounts by the bank were therefore practically loans, secured by assignments of accounts, but remittances were usually made to the Maltby Company, which was supposed then to take up the draft. On October 3, 1902, the bank held this Maltby paper to the amount of $402,000. October 21st the comptroller wrote that this paper must be considered as a direct loan to the Maltby Company, and must be reduced to the permitted .10 per cent. This line had accumulated during the several preceding years under the personal direction of Mr. Bumps, who had been the president and practically the general manager of the bank; but it does not appear that before this comptroller's letter any of the other directors knew that the line did not consist of ordinary drafts being regularly accepted and paid by the drawees.

The comptroller's letter was presented to the board. Inquiry during the next few weeks developed the general character of the paper, and that most of it was not drawn against any real debt, and, in fact, represented no liability, except Mrs. Maltby's. In November Maltby was called before the board, and presented a statement of the company's affairs, showing its net worth to be $188,000; but there were many suspicious things about the inventory, and it does not appear how much of this really primary liability to the bank was

included among the debts. In January, 1903, the bank practically took over the Maltby Company's business, putting its custodian in the office, and then, or later pursuant to the arrangement then made, received conveyances of all the Maltby property, real and personal, and proceeded with general liquidation. During 1903 the bank's accountant separated the Maltby Company's apparent bills and accounts receivable into two classes, the old and the new, and this classification was preserved in monthly reports to the bank. The "old" was mostly made up of these drafts repudiated by the drawees, and late in 1903 still amounted to $240,000. As the liquidation proceeded, the bank charged off successive amounts of this Maltby paper as follows: 1905—February, $135,000; September, $10,000; 1906—March, $10,000; July, $10,000; December, $5,000; 1907—February, $30,000; March, $5,000; 1908—January, $10,000; November, $5,000; 1909—April, $3,000. In this way the total loss so charged off prior to the trial of this cause was $223,000. A comparatively small portion remained uncollected and not charged off. A generally similar situation existed, as to another line of paper (Brotherton) upon which $47,000 had been written off as worthless before April, 1909. The shares of stock were $100 par value, and the writing off of these two items caused a loss in book value of $135 per share.

The bank had seven directors. Chesbrough and McGraw had been two of the directors for many years. Reports to the comptroller were frequently made and published, as required by statute, and as called for by him. Continuously, until 1904, the entire Maltby line was carried at its face in the "loans and discounts," and was reported as part of the bank's assets. Such reports were published in the local paper in February, April, June, September, and November, 1903. Woodworth, at various dates from March to December, 1903, bought (but not from Chesbrough or McGraw) bank stock at its supposed market value, averaging about $151 per share, and aggregating $15,000 par, and $23,400 purchase price.

In 1908, after some years of ineffective litigation in the state courts, Woodworth brought this suit against Chesbrough and McGraw, upon the theory that they had violated section 5239, R. S. (U. S. Comp. St. 1901, p. 3515), by knowingly making or permitting false reports under section 5211 (page 3498), and by paying unearned dividends contrary to sections 5199 and 5204 (pages 3494, 3495), and that plaintiff bought the stock relying on these reports and such dividend declarations, and claiming that they were therefore liable to him for the difference between the value of such stock as so reported, and its true value. His declaration contained ten counts. The first five were based upon the five reports, respectively; the sixth, seventh, and eighth upon the continuance of regular, semiannual dividends during 1902 and 1903; the ninth, upon a violation of the 10 per cent. limitation found in section 5200 (page 3494); and the tenth upon a combination of all the subject-matters of the previous counts. A general demurrer was overruled. Upon the trial, under pleas of general denial, plaintiff withdrew from the jury counts 3, 6, 7, and 8, and the court withdrew counts 1 and 10, submitting counts 2, 4, 5, and 9. Plaintiff recovered a verdict and judgment for the amounts he paid

for his stock, less its then book value after deducting its pro rata share of the actual loss so written off on account of the Maltby and Brotherton paper, and recovered also interest from the date of each purchase until the time of the verdict—an average total of $167 per share. The defendants bring the case here for review.

1. We will not undertake to review specifically the errors assigned. The assignments raise every question that was raised on the trial below, and present the same question many times repeated. They are inexcusably voluminous and detailed. They are 334 in number, and cover 75 pages of the printed record; and this multiplicity is, in large part, responsible for the 560-page record. The broad field covered by the trial justifies an unusual number of assignments, but only a fraction of those taken. We have concluded that in some of the particulars hereafter discussed the conduct of the trial did not conform to what we think the proper rules, and that the judgment must be reversed; but under the discretion given to this court by rule 31 (150 Fed. xcv, 79 C. C. A. xcv), and on account of the form in which the record is brought here, one-third of the otherwise taxable costs, of transcript and in this court, will be deducted.

We will consider the general rules which we think should govern the trial, and assume that the questions raised by the present record, and not so considered, will not arise again.

[1] 2. The general demurrer was rightly overruled. The making and publishing of the reports are not merely for the information of the comptroller, but are to guide so much of the public as may have occasion to act thereon, and he who buys from another stock in the bank, in reliance upon a false report of its condition, and suffers damage thereby, has a right of action under R. S. § 5239, against any officer or director who, knowing its falsity, authorizes such report. The one suffering such damages is within the statutory description "any other person."

It is urged that, as the statute refers to "the association" and then to "its stockholders" before using the phrase "any other person," this last phrase, under the rule of ejusdem generis, cannot be extended to cover those who purchase bank stock in the market. This argument must be considered in connection with the cases of Yates v. Jones National Bank, 206 U. S. 158, 27 Sup. Ct. 638, 51 L. Ed. 1002, and Yates v. Utica Bank, 206 U. S. 181, 27 Sup. Ct. 646, 51 L. Ed. 1015, in which the Supreme Court seems to hold that strangers to the bank who are, by false reports, induced to make a deposit therein, are within the protection of this statute; and we are unable to find any basis of classification for applying the rule of ejusdem generis which would include those induced to become depositors and exclude those induced to become stockholders. The suggestion on the argument that the statute contemplates only those whose injury is derivative from an injury to the bank cannot be accepted, since the injury to the depositor in the Yates Case was not of that class. Nor is the statute one calling for the strict application of the rule invoked. The general banking law has made a great variety of regulations and requirements, and violations thereof would injure an equally great variety of per-

·sons. The phrase "any other person" was especially appropriate, for the reason that detailed enumeration would have been very difficult.

The conclusion that a right of action accrues to one in plaintiff's alleged position is supported by the analogy of Prescott v. Haughey (C. C. Dist. Ind.) 65 Fed. 653, Mason v. Moore, 73 Ohio St. 275, .76 N. E. 932, 4 L. R. A. (N. S.) 597, 4 Ann. Cas. 240, and Smalley v. McGraw, 148 Mich. 384, 111 N. W. 1093, 112 N. W. 915, although the conclusions of these cases are modified by the Yates Case. There is analogy also in the reasoning and conclusion of this court in Davis v. Louisville Trust Co., 181 Fed. 10, 19, 20, 104 C. C. A. 24, 33, 34, 30 L. R. A. (N. S.) 1011, and in Hindman v. Bank, 98 Fed. 562, 569, 39 C. C. A. 1, 7, 48 L. R. A. 210.

[2] 3. The damages in such a case are personal to the plaintiff. He sues in his own right, not for the association. It suffers no such damage as plaintiff does by the report, and hence it or its receiver has no concern with this kind of an action. It is true there might be a very large number of instances of individual injury resulting from one false report, making a burdensome volume of litigation; but each instance is individual, involving specific causal relation between report and damages, and the similar instances have no legally common character.

[3] 4. Such action involves no direct issue of negligence. The directors are not exonerated solely because they acted in good faith in making the original loan; nor are they liable merely because they negligently made or permitted to be made reckless or bad loans, or negligently failed to collect loans that were collectible, or because with diligence and care they would have known that loans, reported as assets, were bad. The sole primary issue is whether defendants caused or permitted to be made a statement of the bank's condition, upon which statement plaintiff relied to his injury, and which statement defendants knew was materially false. In the trial of this issue the detailed history of the entire transaction and of each defendant's connection is, speaking generally, admissible as tending to show whether the loans were at the time in question in fact bad, and whether each defendant knew that fact, but not as otherwise establishing any liability.

5. The liability of the directors upon such a subject-matter is several. The plaintiff may arbitrarily select one as sole defendant or two or more to be joined as defendants. Against each individual selected, a sufficient case must be made out to show that he participated in the tort for which a verdict is had; but the plaintiff's reasons for the selection are wholly immaterial (unless indeed such reason might involve personal feeling affecting plaintiff's credibility as a witness).

6. As hereafter stated, the action of the board of directors in not charging off this paper is involved. When the thing criticized is the positive action of the board, plaintiff should affirmatively show that the selected defendant in some way participated or assented to this action; and when the foundation of the suit is the nonaction of the board, and such wrongful nonaction appears, that defendant's individual responsibility rests upon the same considerations—i. e., it must

appeal that he participated in or assented to the wrongful inactivity, by failing to make reasonable personal efforts to induce the proper action.

[4] 7. In such a case as this, the making of the report, its attesting by the directors, and its publication do not constitute the underlying wrong. They make only the means of representation to plaintiff—the medium of necessary causal relation between wrong and damage. Under what is said to be the universal practice of national banks in making such reports, and under what the undisputed testimony shows to have been the regular practice in this bank, the making and publishing of the reports were the automatic results of the bookkeeping. Whatever the books and the daily statements showed the resources to be appeared as resources on the report. If a line of paper was carried at its face among the "loans and discounts" on the books, it would normally appear at that same amount in every one of the five reports in each year. Both defendants knew this. It follows that it is not important whether each did or did not attest each report (except so far as plaintiff's conclusion to buy might rest on the presence of a particular name at the foot of the report plaintiff saw). All directors who participate in and approve a long-continued carrying on the books, among the loans and discounts, of a line which they know is worthless, and in amount sufficient materially to affect the standing of the bank, are bound to know that under the practice prevailing in this bank such worthless paper will become an element of the published reports, and that these reports will in so far falsely represent to the public the bank's condition; and so, in a fair sense, such director permits the making of a report which is a violation of the act. Hence his primary duty here involved, and a breach of which causes a violation of the statute, is the duty to charge off assets which have become worthless.

[5] 8. This duty to charge off is, it is true, that of the board as an entity; but, as above stated, when the duty is wholly unperformed by the board, an individual director who was engaged generally in the performance of his functions may, nevertheless, be individually liable because of his participation in the failure to act. Nor is this duty an absolute one, arising definitely as to each piece of paper the moment its collection becomes impossible. A failure to charge off a thousand dollar note after the directors know it is uncollectible, and in a bank with a million dollars of assets, could not support such an action as this. There must be a reasonable margin of honest discretion as to the amount of paper which the board may carry after it has become presently uncollectible. This will depend upon the state of the "undivided profits" account, upon the amount of assets which have been written off but which are thought to be good, and perhaps upon many other circumstances. There must also be a reasonable time for consideration after a debtor has become unable to pay, and the directors know his paper is, in a strict sense, then worthless. How much, if any, of this paper should still be carried as an asset and for how long will depend upon his moral character, his prospects for recouping his losses, etc. Here, again, an honest discretion must be

195 F.—56

used. Speaking as we are of that duty to unknown persons among the public, the breach of which will support this action, we cannot make a more accurate formulation than to say that the duty to charge off arises when, and so far as, the directors know they are carrying uncollectible paper beyond that reasonable amount and beyond that reasonable time permitted by an honest exercise of their official discretion. In other words, it arises when they know that longer carrying will, through the medium of regular reports or otherwise, normally result in substantially misleading the public as to the net value of the bank's assets.

9. Whether particular paper is enforceable against the person apparently primarily liable thereon is not controlling of the duty to charge off. The criterion on this part of the whole question is whether the debt is collectible from any one or will be paid by any one. So it does not for this purpose establish the worthlessness of the Brotherton line to show that the Brotherton drafts had been accepted for his accommodation or that the drawees were irresponsible, nor does it establish the worthlessness of the Maltby line to show that the railroad and telegraph companies did not owe Maltby. It is necessary to be able to conclude that no person liable, including Brotherton and Maltby respectively, could be compelled to, or voluntarily would, make the bank good.

[6] 10. That the Maltby and Brotherton loans may have exceeded the 10 per cent. limit prescribed by section 5200 has no tendency to support this action; and count 9 of the declaration is not good. Such excess would have no bearing on either of the two main issues— whether the debts were worthless, and whether to the knowledge of the defendants. The excessive character of a loan is no defense to its collection (Union, etc., Co. v. Bank, 96 U. S. 640, 24 L. Ed. 648); nor does such excessive character tend to show that the debtor is irresponsible. Indeed, usually, excessive loans will be to the debtor believed most responsible. If the original taking of the paper was involved, we would have to meet the proposition that the directors could not, by their own good judgment and good faith, justify doing an act forbidden by law; but the original taking is not here involved. Plaintiff was not, at such time, a stockholder. In 1903 these loans had been among the bank's assets for a long time; and, while they continued to be real assets, it was the duty of the directors to carry and report them as assets.

Although excessive loans are forbidden by the statute, yet the forfeiture of the charter is the only penalty denounced; and, the comptroller not having claimed a forfeiture for this reason, we can trace no damage flowing from this cause to the plaintiff. Plaintiff's loss was not "in consequence of" the fact of excess. He was not injured because the loans were beyond the limit, but because they were bad and were reported to him as good and he was thereby misled into paying too must for the stock. There is no middle ground between holding that section 5200 is not involved in this suit and holding that each participating director becomes practically a guarantor of the col-

lection of all excessive loans carried by the bank; and this latter result we cannot accept.

11. If dividends were declared which defendants knew must be paid out of capital stock and not out of the existing surplus earnings, that would be material in establishing plaintiff's substantial asserted grievance; i. e., that defendants participated in, or assented to, so conducting the bank's affairs as to maintain, knowingly, a fictitious market valuation upon the stock. We can find in the record no ground for a jury to conclude that any one of plaintiff's purchases materially depended upon any one dividend declaration, and counts 6, 7 and 8 were properly withdrawn; but count 10 as we think states, in its terms and by reference, and in a sufficiently unitary way, what we have described as the substantial asserted grievance, and under this count evidence of the dividends might be pertinent.

12. In this class of cases, where defendants' actions are to be, from all the circumstances, classified as honest or dishonest, things which indicate that defendants had a motive and profited by their supposed unfair conduct are material. Therefore plaintiff was entitled to show, if he could, that after defendants knew that the Maltby loan, involving more than the whole capital and surplus was at least very doubtful, they sold, at the high price, most of the bank stock owned by themselves and their relatives, and thus, in his language, "deserted the ship."

[7] 13. In December, 1904, the directors sent a letter to the stockholders, admitting very large losses, recommending that the capital stock be reduced to $100,000, and calling a meeting for January 26, 1905, to vote on this plan. January 10, 1905, plaintiff was elected a director. At the stockholders' meeting, the reduction plan was adopted, and the next month, but evidently pursuant to the plan under consideration since December, $135,000 of the Maltby paper was written off as worthless. On January 17th, and immediately after his election as director, plaintiff attested one of the regular, official reports which included among the assets the entire Maltby line at its face; and in August, 1905, he joined in a similar report which so included the Maltby paper then remaining, being the $88,000 which was later charged off. We do not find in these acts by plaintiff any estoppel against maintaining this suit; nor is his action taken in January, in reporting the $135,000 among the assets, of any evidential force against him. The charging off of this amount was so nearly simultaneous with the report, and was so evidently then in contemplation and understood by every one concerned, that no inference against plaintiff should rest on the inclusion of this paper in that report. However, plaintiff's conduct in then reporting and subsequently carrying and again in August reporting as among the "loans and discounts" the remaining $88,000 of the Maltby paper, upon the basis of the worthlessness of which plaintiff now has a verdict, was for the jury. Where defendants' honesty is to be judged by their conduct in a given situation, and plaintiff is later placed in the same situation and acts as defendants did, they are entitled to argue, with what force they may, that such action by him tends to show such conduct by them to be

rightful; otherwise, plaintiff would be stultified. In other words, plaintiff's conduct in this particular is in the nature of an admission that the $88,000 was not so worthless as to require immediate writing off. Like most other admissions, it is not conclusive, and its force depends upon many contingencies. If, however, the jury which tries the case again should, upon the record then shaped, conclude that plaintiff's knowledge along in 1905 regarding the worthlessness of this paper was equal to that of defendants' along in 1903, and if the jury, influenced in part by this conduct by plaintiff, should conclude that defendants, in 1903, believed that at least $88,000 of the Maltby paper afterward charged off, would be collected, and that the loss would be confined to a maximum of $135,000—then any recovery by plaintiff should be confined to the same basis.

14. With reference to the Brotherton paper, we find nothing in the record sufficient to support a verdict for plaintiff upon the theory that either of the defendants at a date earlier than that of the November, 1903, report knew that any loss had been here made certain enough and large enough to require writing off. The Brotherton failure did not occur until December 19, 1903; and although it appears that as early as the previous March one or both defendants knew Brotherton was putting in accommodation paper, and that the bank then ordered him to clean off this kind of paper and reduce his line, as being too large for his credit, yet this comes far short of establishing the kind and degree of knowledge requisite to maintain this action. It also appears that just before the failure defendant McGraw stated that the Brotherton business had been "rotten" for three years; but he would naturally have acquired such knowledge during the investigation just made, and the statement does not tend to show that he had such knowledge three years or any other long time before. In these and other circumstances tending to show negligence there is nothing of substance to support a finding of liability, under the rules we have announced. Knowledge that Brotherton's drafts were not collectible or valid against the drawees is not knowledge that he could not and would not pay. Indeed, it is rather evident that if the bank had obtained, early in 1903, its later knowledge of his desperate condition, it would not for so long have postponed the closing up. Upon the record now under review, and under the rule which we later state as to the measure of damages, a verdict should have been directed for defendants upon so much of plaintiff's claim as was based on the Brotherton loss.

15. Regarding the Maltby line, there were sufficient circumstances indicating that each defendant, as a man of ordinary business experience and knowledge, must have fully realized, and so did realize, before February, 1903, that a very large loss was inevitable, and, in fact, had then been suffered. The large amount of Maltby's frauds already then developed the (comparatively) enormous extent of the loans to the Maltby Company, the nature of his inventory submitted, the extent of the "old" drafts and the time they had been carried, the denials of indebtedness by drawees, the participating of each defendant in going into the subject at board meetings or privately, and many

other circumstances, lend support to this result; and required submitting to the jury the issue of fact whether defendants did know that such loss existed. It is impossible, however, to find logical basis or intelligent theory supporting the conclusion that the defendants in 1903 knew that the Maltby loss was the exact amount which did develop after five years of liquidation, viz., $223,000. Upon this record, the conclusion that the defendants then realized the loss to be $135,-000, the amount which was charged off at an early date, could not be held unsupported by the evidence: but, remembering that about January, 1905, the board somewhat publicly fixed the loss then known on this account at $135,000 and declared that the remaining $88,000 was worthy of being carried as an asset, and that the comptroller's office, with good opportunity for knowledge, must have approved this course, and that plaintiff himself acquiesced in and joined in this declaration when he had at least fair means of knowledge, and that common experience shows that losses in such a case develop and increase in liquidation beyond the amount first expected—considering all these things, we think that upon this record a verdict, so far as it might reach the $223,000 basis, would depend only on conjecture and speculation, and could not stand. The jury upon the trial below adopted the $223,000 basis perhaps as the result of applying a rule of damages which we think inappropriate; and so what we have said on this subject is with special reference to the new trial and on the supposition that it would be in this respect upon an essentially similar record.

[8] 16. In the ordinary common-law action of deceit in inducing the purchase of property, the measure of damages is the difference between the sum plaintiff expended in reliance on the representation (i. e., what would have been the fair market value of the property if the representation had been true, but not exceeding the sum paid) and the actual intrinsic value of the property which the plaintiff did receive. Smith v. Bolles, 132 U. S. 125, 10 Sup. Ct. 39, 33 L. Ed. 279; Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113; Wilson v. New U. S. Co., 73 Fed. 994, 997, 20 C. C. A. 241; Bank v. Burlington Co. (C. C.) 100 Fed. 673–674; Simon v. Goodyear Co. (C. C. A. 6) 105 Fed. 573, 579, 44 C. C. A. 612, 52 L. R. A. 745; Hindman v. Bank (C. C. A. 6) 112 Fed. 931, 50 C. C. A. 623, 57 L. R. A. 108.

The literal application to such a case as this of the rule so formulated would bring it about that if defendants carried and reported as assets $135,000 of Maltby paper which they knew to be worthless, and if plaintiff's reliance on the report appeared, then defendants would be liable also for the $88,000 further Maltby loss and the $47,000 Brotherton loss really then existing, though they then believed both these later items to be good, and were not even negligent in regard thereto. The measure of damages would be just the same whether they acted in good faith or in bad faith in carrying and reporting these two items. It would also follow that a director, transgressing in relatively small amount the rules governing reports, or who must submit to a jury the question of such transgression, might be liable for the

existing defalcations of the cashier which the director had no reason to suspect. These results challenge close-consideration of the rule which is said to make them necessary.

This is not the common action brought by a defrauded vendee against a misrepresenting vendor and where the vendor defendant has received the money with which the plaintiff vendee parted, like the case of Smith v. Bolles; nor is it essentially a case where the defendant, a stranger, colluded with the vendor to bring about a sale in such a way that the defendant would receive the ultimate benefit of the transaction, as was the Hindman Case. Such circumstances of the latter character as appear are incidental and evidential and do not lie at the basis of the action. We have here to consider an action based upon one section of the banking law, and that section must be construed in connection with the whole law, to determine the intent of Congress regarding the extent of the liability which it was declaring. We find that Congress carefully distinguished between knowing and unknowing violations of the law, in effect declaring the directors liable for the former, and not for the latter. A holding that for a knowing violation they are liable also for the results of an unknowing violation, or of what is no violation at all, tends to obliterate this distinction. We find also that the statute limited this liability to such as occurred "in consequence of" such violation. We think this, read in connection with the word "knowingly," should not be interpreted as imposing upon directors, at the complaint of those who are not interested in the bank at the time of a false report, any liability beyond that having direct connection with the falsity; in other words, the connection between a report, false in one element, and losses to stock purchasers from causes not included within the element so falsified, is not close enough to justify the conclusion that Congress was speaking of a "consequence" so far fetched.

It is another familiar rule of the measure of damages in analogous cases that the damage must be such as the defendant should naturally have anticipated would follow from his misrepresentation. Crater v. Binninger, 33 N. J. Law, 513, 518, 97 Am. Dec. 737, cited in Smith v. Bolles, 132 U. S. at page 130, 10 Sup. Ct. page 40 (33 L. Ed. 279). Applying this principle for concrete illustration to the present case, it might well be true that the directors knowing the established and familiar rule of the banking law that care and good faith constitute the criterion of their duty in taking or carrying bank assets, and believing that as to the Brotherton paper they had violated such duty in no particular (and indeed believing it was good), would by no means have anticipated or should have anticipated that stock purchasers would suffer loss on the Brotherton account. It is not easy to see how it can be said that they should have anticipated a loss upon paper as to which they did not believe there would be any loss; and that is what it comes to if we say that the losses upon all paper which was then in fact bad must be charged against them in this situation.

In the Yates Case the precise measure of damages, under circumstances like the present, was not involved. The fact of the insolvency of the bank, known to the directors, had been by them concealed and

the entire loss suffered by a depositor who became such because of this concealment, was a necessary consequence of the concealment. No question arose of a loss resulting in part from a statement known by the directors to be false and in part from other causes. In the Hindman Case the measure of damages was involved, but the peculiar force of such circumstances as here exist was not considered.

It results that with reference to each purchase by Woodworth in this case his measure of damages, if the issues are found for the plaintiff, would be the difference between the fair market value of the stock purchased if all the Maltby and Brotherton paper had been of a character entitling the directors to report it as assets (and the testimony does not indicate that this value differed from the price paid) and that sum which would have been its fair market value if the defendants had written off and had not reported as assets so much of the Maltby paper as it may have been their duty to write off under the rule above declared on that subject.

He is also entitled to interest at 5 per cent. from the date of his purchase to the date of the verdict. True, he has the stock, and, though it has not paid dividends, it has appreciated in value more than interest on its face; but, if it had been of the value indicated by the reports, it would also (probably) have appreciated or paid dividends. Plaintiff has that stock value which he did get and the appurtenant gain; and for that further stock value, if any, of which he was wrongfully deprived, he should have damages and the appurtenant interest.

17. It is clear from what has been said that if the jury accepts the theory of either defendant that up until December, 1903, he believed the Maltby loan was secured, and that the bank eventually would not meet with any serious loss thereon, and that each charging off entry was made with reasonable promptness after he realized that the item charged off was worthless, then that defendant is fully exonerated. We do not intend by stating the matter in this way to touch the rule of burden of proof. Under the statute which gives the liability only for a knowing violation, the burden remains upon the plaintiff to show bad faith, as distinguished from the good faith just mentioned.

The judgment will be reversed and the case remanded for new trial. The plaintiffs in error will recover only two-thirds of their costs in this court, and, upon any ultimate taxation in the District Court under rule 31, only two-thirds of the cost of the transcript.

## On Motion to Modify.

[9] Defendant in error (plaintiff below) moves to modify the opinion and judgment in such manner as to permit the plaintiff below to remit all that part of his judgment which we thought was not supported by the evidence, and that the judgment below, as modified by such remittitur, be then affirmed. The practice of affirming, as so modified, judgments which would otherwise have been reversed, we have followed in Huebel Co. v. Leaper, 188 Fed. 769, 110 C. C. A. 475, and in Mosby v. Printy & Jones, 194 Fed. 346 (decided March 5, 1912); and we thoroughly approve the practice, in any case where the record is so shaped as to show that certain elements of the ver-

dict might have been affected by the error, and that the remainder of the verdict could not have been so affected. In Huebel v. Leaper, the jury, at the suggestion of the court, returned a written memorandum of its computation, showing exactly how much had been allowed to plaintiffs on account of the two items held erroneous; and this memorandum went into the record without objection. In Mosby v. Printy & Jones the bill of particulars, the charge of the court, and the peculiar figures of the verdict made certain the precise amount which must be remitted in order to cure the error. In the present case we are not satisfied that any amount can be fixed, the remitting of which will neutralize the errors in the trial.

1. The ninth count, charging a violation of section 5200, was submitted to the jury. This we have held was error. A review of the entire charge shows that the violation of this section was put before the jury as constituting "strong evidence" of defendant's knowledge that the paper in question was bad, and satisfies us that it is not improbable that the entire verdict was, by some or all of the jury, rested upon this theory. This consideration alone entitles the directors to another trial of the main issue of fact.

2. Our opinion as to the Brotherton paper (paragraph 14 of the opinion) was intended to cover plaintiff's whole claim, including his stock purchase made December 16, 1903. The defendants' liability cannot be estimated as of this date. Their latest act, which was constructively a representation of fact by them to plaintiff, was during the previous month.

3. It is suggested that the questions we considered in the opinion were not raised in this court by plaintiff in error. It is sufficient to say that several points, among them the one regarding section 5200, were distinctly raised, and that as the case was to be reversed it was not inappropriate to discuss other questions necessarily involved.

4. Since the opinion was filed the Supreme Court has decided Thomas v. Taylor, 224 U. S. 73, 32 Sup. Ct. 403, 56 L. Ed. —— (March 18, 1912). This case in its result supports the general conclusion that a liability exists in such a case as plaintiff claims the present one to be, and we find nothing in it inconsistent with our opinion. The case does not seem to have called for any consideration of the exact rule of damages, nor of the standards which directors must follow in deciding whether to eliminate or to carry and report each specific asset. It was dominated by the conclusions of fact that the report was false, that the directors knew it was false, and that there was "in effect" an intentional violation of the statute. There is language in the opinion which could be construed to mean that, when an asset of a bank is criticised by the comptroller, it is the duty of the directors immediately to charge off that asset—even though they may believe it to be perfectly good, and even though it may in fact be perfectly good—and that the directors are liable to a purchaser of stock solely because they have not followed such direction. The case, however, did not call for such a conclusion, and we do not think the language should have that construction.

The motion to modify is denied.