## CLEVELAND LINSEED OIL CO. v. A. F. BUCHANAN & SONS.

(Circuit Court of Appeals, Second Circuit. January 8, 1903.)

### No. 41.

**1. SALE—IMPLIED WARRANTY OF FITNESS—PLEADING.**

Allegations in a complaint that "defendant contracted and agreed to deliver to the plaintiff * * * one tank car of well-settled new process linseed oil * * * for use in its business of manufacturing table and enameled oilcloth, and which defendant well knew was to be used in its said business and to manufacture table and enameled oilcloths," are sufficient to raise and support an implied warranty of fitness in a sale by a manufacturer for a particular purpose.

**2. SAME—MANUFACTURED ARTICLES.**

Plaintiff was engaged in the manufacture of oilcloths in which a special quality of linseed oil was required. Defendant was a manufacturer of oil, and its agent called on plaintiff, and represented that it was using a new process, by which a superior article of oil for plaintiff's use was produced. They tested a sample, which proved fit for plaintiff's use. Defendant's agent promised that if plaintiff would give an order he would see that the right kind of oil was furnished for its use, and thereafter plaintiff purchased large quantities, which were satisfactory in use. At one time plaintiff gave an order for two tank cars of the same oil as it had before. One car was received and emptied into plaintiff's tanks and used. It proved of inferior quality, not fit for such use, and a large loss resulted. *Held*, that there was an implied warranty by defendant that such oil was of the same quality as that previously furnished plaintiff, and fit for the purpose for which defendant knew it was to be used.

**3. SAME—ACTION FOR BREACH OF WARRANTY—MEASURE OF DAMAGES.**

In an action for breach of such warranty, in which it was found that plaintiff was not negligent in using the oil in reliance thereon, the measure of damages was the loss actually sustained by reason of such use, and to enable the jury to determine the amount evidence was admissible showing that goods sold by plaintiff were returned by customers because of defects due to the poor quality of the oil, or were unsalable, and that in other cases plaintiff was obliged to settle with customers and pay the differences in the value of the goods due to such defects.

In Error to the Circuit Court of the United States for the Southern District of New York.

H. G. Ward, for plaintiff in error.

Sidney H. Stewart, for defendant in error.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. Writ of error by defendant in court below from a judgment of the United States Circuit Court for the Southern District of New York entered on a verdict for $7,436.37 in favor of plaintiff.

At the time of the transaction involved herein the plaintiff corporation was engaged in the business of manufacturing table and enameled oilcloth. The defendant corporation was the manufacturer of what was known as "new process linseed oil." Its agent, Butterfield, called on the president of the plaintiff corporation at its factory with a sample of said oil, explained the details of the new process, and that it was especially adapted to the elimination of an objection-

able product known as "foots." Oil which does not contain foots is known as "well settled," and only such oil could be used by plaintiffs in their business. The presence of foots in linseed oil cannot be detected by the eye. The usual test applied is by heating in a test tube up to 560 degrees. Butterfield and plaintiff's president thus tested the sample, and it stood the test. Butterfield said that this oil would be satisfactory to manufacture tablecloth. Plaintiff then ordered 10 barrels for trial, which proved to be unsatisfactory, by reason of the presence of foots. Butterfield again came to the factory, and promised that, if defendant could get another order, he would see that the right kind of oil came to them, or that it should be perfectly satisfactory. Thereupon plaintiff gave an order for some 3,000 gallons, subjected the first car load to a laboratory test, found it well-settled oil, free from foots, and used it in manufacturing oilcloths, and continued such use of defendant's oil for some six or seven months. The last sale to plaintiff prior to the one involved herein was specified to be of 40,000 gallons of pure well-settled new process oil. While defendant was still making deliveries under said contract, defendant's agent called on plaintiff's treasurer, Andrew Buchanan, to make a further sale. Buchanan said he wanted oil such as had been delivered before. Defendant's agent accepted an order for two tank cars of the same oil as plaintiff had had before, and one tank car was emptied into plaintiff's tanks. It was not well settled, and its use in making oilcloths which were not merchantable was the original cause of the damages herein complained of. The other car was afterwards returned to defendant. In the view we have taken of this case it is unnecessary to consider the question whether, under the circumstances, plaintiff could or should have tested the oil in this tank car before using it. The oil was not open to inspection, and an inspection would not have shown the defect complained of. Said oil was used in the manufacture of 2,100 rolls of table oilcloths, the fair market value of which would have been $1.65 per roll if the oil had been suitable. By reason of the defect in the oil the cloths were so damaged that plaintiff was obliged to sell them at public auction. The difference between the price thus obtained and the fair market value, with interest, was $1,714.22. Part of the other oilcloth made with this oil was returned by customers; some of it was so bent that it could not be straightened, and it was burned; some was so stuck together that it could not be sold, even in an auction house. Plaintiff settled as well as it could with its customers by giving the lowest allowances possible in each case. Plaintiff proved the loss by showing the allowance paid in each case; or, in case of sales, by the difference between the market value and price received. The jury returned a verdict for the amount of damages thus proved. Defendant has excepted to the refusal of the court to direct a verdict for defendant, on the ground that no cause of action on a warranty was stated in the complaint.

The complaint alleged that "the defendant contracted and agreed to deliver to the plaintiff * * * one tank car of well-settled new process linseed oil * * * for use in its business of manufacturing table and enameled oilcloth, and which defendant well knew was to

be used in its said business, and to manufacture table and enameled oilcloths." These allegations are sufficient to raise and support an implied warranty of fitness in a sale by a manufacturer for a particular purpose.

Defendant has also excepted to the refusal of the court to charge that there was no warranty in the sale, and that the plaintiff, having accepted and used the oil, could not complain that it was not well settled. Counsel for defendant relies upon the distinction between conditions which are a part of the contract of sale and warranties which are collateral to said contract, and insists that the case at bar belongs to the former class, in which he asserts that the only remedy of a purchaser is in a refusal to receive, which is waived by acceptance and retention of the article purchased.

There is an apparently irreconcilable conflict of authority as to the distinction between warranties and conditions and as to the rights and obligations of the parties thereunder. Much of the confusion has arisen from the fact that what are generally considered in this country as warranties that the article shall be of the kind or species contracted for, were, prior to the passage of the sales of goods act in England, and are in some of the courts of this country, treated as conditions precedent. Benjamin on Sales (7th Ed.) pp. 589, 594, 677; Carleton v. Lombard, Ayres & Co., 149 N. Y. 147, 43 N. E. 422. Furthermore, the word "warranty" has been used in such a great variety of senses, and the decisions thereon have been so anomalous, that, as a distinguished jurist has said, "an attempt to arrive at a satisfactory conclusion about any principle supposed to be established by them would be hopeless, if not absurd." Chief Justice Gibson in McFarland v. Newman, 9 Watts, 55, 34 Am. Dec. 497.

The cases relied upon by counsel for defendant are forcible illustrations of this statement. In Reed v. Randall, 29 N. Y. 358, 86 Am. Dec. 305, defendants agreed to sell to plaintiff a crop of tobacco then growing, "well cured and boxed, and in good condition." A majority of the court held that a warranty could not be predicated upon said engagement, and that the rules of law by which the rights of parties in respect to warranties are regulated were inapplicable. In Coplay Iron Co. v. Pope, 108 N. Y. 232, 15 N. E. 335, an executory agreement to sell "No. 1 extra foundry pig iron of the Coplay Iron Co. make" was held not to be a warranty, but a mere description of the article to be sold. On the other hand, the courts of the state of New York have held that in a sale of "blue vitriol sound and in good order" the trial court could have decided, as a question of law, that there was a warranty that it was sound and in good order (Hawkins v. Pemberton, 51 N. Y. 198, 10 Am. Rep. 595), and that a contract to sell "pipe iron which should be of a quality suitable and proper for use in the defendant's manufacturing business * * * was an express agreement or warranty that it should be of that specified or designated quality." Dounce v. Dow, 57 N. Y. 16. The decision in White v. Miller, 71 N. Y. 118, 129, 27 Am. Rep. 13, is to the same effect. And the later New York decisions agree that, in case of breach of an express warranty as thus defined, the warranty survives the acceptance. Brigg v. Hilton, 99 N. Y. 517, 529, 3 N.

E. 51, 52 Am. Rep. 63; Fairbank Canning Co. v. Metzger, 118 N. Y. 260, 265, 23 N. E. 372, 373, 16 Am. St. Rep. 753. In the latter case Chief Judge Parker, approving the doctrine that a positive affirmation, relied on as such by the vendee, is an express warranty, quotes with approval from an opinion by Judge Learned as follows:

"There can be no difference between an executory contract to sell and deliver goods of such and such a quality and an executory contract to sell and deliver goods which the vendor warrants to be of such and such a quality. The former is as much a warranty as the latter. 101 N. Y. 616, 3 N. E. 905."

The right of the vendee to recover damages in such cases after acceptance is sustained in other jurisdictions. Underwood v. Wolf, 131 Ill. 425, 23 N. E. 598, 19 Am. St. Rep. 40; Morse v. Moore, 83 Me. 473, 22 Atl. 362, 13 L. R. A. 224, 23 Am. St. Rep. 783. But even the case of Reed v. Randall, as limited by Day v. Pool, 52 N. Y. 416, 11 Am. Rep. 719, is only authority for the proposition that where there is no collateral or express warranty, but the representation as to the quality is part of the contract itself, "the remedy of the vendee to recover damages on the ground that the article furnished does not correspond with the contract does not survive the acceptance of the property by the vendee after opportunity to ascertain the defect." Waeber v. Talbot, 167 N. Y. 48, 60 N. E. 288, 82 Am. St. Rep. 712. The doctrine of Reed v. Randall has been denied in England. Freeman v. Baker, 5 Car. & P. 475, 483; Yeats v. Pim, 2 Marsh. 141. See Morse v. Moore, supra.

In the case at bar the defendant, being a manufacturer, promised the plaintiff that if it would give defendant an order it would see that the right kind of oil came to it for use in making oilcloths in its factory. Defendant duly furnished such oil for such use, which, upon being tested, was found free from foots, and, therefore, fit for such use. Thereafter defendant continued to furnish, and plaintiff continued to use, said oil; and when plaintiff gave its last order, defendant specially agreed that it should be like the oil that had been sent to plaintiff.

The same questions were considered by Judge Wallace in the case of Bagley v. Cleveland Rolling Mill Co. (C. C.) 21 Fed. 159. There the defendants, being manufacturers, undertook to furnish to plaintiffs a certain quality of steel for the facing of vise jaws. The defendant sent a sample, which was tested and proved unsatisfactory. Thereafter defendant sent other lots of steel, which were satisfactory, and later, in response to an order for "same quality as last," sent a lot which was a failure. This lot was returned, and the order was filled by a new shipment, which was used in making vises. After the vises had been sold it was found that the steel was too brittle for this purpose, and plaintiff notified defendant of the facts, returned a portion of the steel, and, later, brought suit and recovered damages. It will thus be seen that the legal relations of the parties were identical with those of the parties herein. The court denied a motion for a new trial, and held that there was an agreement on the part of defendant that the steel should be of the same quality as the lots previously sent; that there was a breach of said agreement; and that plaintiffs owed no duty to defendant to test the steel before using it. The

court in its opinion discussed, inter alia, some of the cases already referred to, and reached the following conclusions:

"Manifestly, there is no distinction in principle, as to the rights and remedies of a purchaser, between a cause of action arising out of a breach of contract by the vendor to deliver an article of a specified quality or description, or out of a breach of a representation which is collateral to the contract, or out of such a breach when the representation or warranty is implied instead of being express. In either case there is an agreement, in substance and purport, to the same effect; in either, a breach of it works the same injury to the vendee; and in either, the same presumption of fact arises from an acceptance of the article after the discovery of its defects. Whether the cause of action is for a breach of a contract or for the breach of a warranty is a mere matter of nomenclature (Hastings v. Lovering, 2 Pick. 214); and the breach of a promise implied by the law works the same consequences, imposes the same obligations, and creates the same rights, as the breach of an express promise."

We concur in these views. The general rules governing contracts between manufacturers and purchasers were fully considered in this circuit in the very recent case of Dodge v. The Dickson Manufacturing Company, 51 C. C. A. 175, 113 Fed. 218.

The principles directly applicable to the case at bar are thus stated by the Supreme Court of the United States in Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 3 Sup. Ct. 537, 28 L. Ed. 86:

"When the seller is the maker or manufacturer of the thing sold, the fair presumption is that he understood the process of its manufacture, and was cognizant of any latent defect caused by such process, and against which reasonable diligence might have guarded. This presumption is justified, in part, by the fact that the manufacturer or maker, by his occupation, holds himself out as competent to make articles reasonably adapted to the purpose for which such or similar articles are designed. When, therefore, the buyer has no opportunity to inspect the article, or when, from the situation, inspection is impracticable or useless, it is unreasonable to suppose that he bought it on his own judgment, or that he did not rely on the judgment of the seller as to latent defects of which the latter, if he used due care, must have been informed during the process of manufacture. If the buyer relied, and under the circumstances had reason to rely, on the judgment of the seller, who was the manufacturer and maker of the article, the law implies a warranty that it is reasonably fit for the use for which it was designed, the seller at the time being informed of the purpose to devote it to that use."

The same rule is applied in such cases in the state of New York. Carleton v. Lombard, Ayres & Company, 149 N. Y. 137, 43 N. E. 422; Bierman v. City Mills Company, 151 N. Y. 482, 45 N. E. 856, 37 L. R. A. 799, 56 Am. St. Rep. 635. In the present case, however, the court below left to the jury the question whether plaintiff had exercised proper care in the examination and inspection of the oil before using it. The charge was, at least, as favorable to the defendant as it had a right to demand, and the exceptions thereto on the foregoing points are overruled.

The exceptions further challenge the correctness of the charge on the measure of damages. The court charged the jury, inter alia, as follows:

"If they exercised due diligence, that of prudent men in going on and using it and making it into oilcloth and sending it to customers—if they did all that could be expected of prudent men—then you will go further and give damages for what they lost in consequence of the oil being bad and being used in that way."

Later, counsel for defendant having asked the court to charge that the measure of defendant's liability was the "difference in the value of the oilcloth as manufactured with the oil delivered, and what the oilcloth would have been worth if the oil had been what was agreed," the following colloquy occurred between court and counsel:

"The Court: Is not that what is left to the jury now? Mr. Ward: I do not so understand. The Court: I understand it so. Mr. Ward: Your honor charges that? The Court: Yes; the jury understand that."

No further exception was taken after this statement. It must be assumed that counsel was satisfied with the charge as thus interpreted. The court had already repeatedly stated the general rule in apt language to be understood by the jury, that the defendant's liability, if any, was for the direct natural consequences resulting from the use of said oil as defendant understood it was to be used. In order, however, to avoid any misunderstanding, it further explained the legal effect of its charge in accordance with the request of counsel for defendant. This exception to the charge is overruled.

Counsel for defendant objected to the admission of the testimony of plaintiff's treasurer as to amounts paid to customers in settlement as aforesaid. The ground of the objections and the theory on which said evidence was admitted is shown by the following excerpt from the record:

"Mr. Ward: I object to a lump sum, and think the witness should be required, under your honor's ruling, to state the names of the customers. The Court: These figures are given with the idea that the fact is to be made out that they came from this bad oil. Mr. Ward: I understand; but my objection is that they cannot say they paid a lump sum. I have a right to know who the customers were, and what each received."

Subsequently the witness was recalled, and produced copies of letters showing the names and addresses of each customer, and the amount paid to each in settlement of his claim, and no objection was made or further exception taken to said testimony.

It is clear that the finding of the jury as to the amount of damages sustained was correct. The measure of damages in such cases is the loss actually sustained by the breach of the warranty. Ferris v. Comstock, 33 Conn. 513. It may be shown by evidence as to the difference between the actual value of the damaged goods as manufactured and the value of such goods if the article supplied for manufacture had conformed to the warranty. Hook v. Stovall, 26 Ga. 704. Evidence showing the return of the oilcloth on account of such defects, or that the goods were unsalable, or that plaintiff was otherwise subjected to loss by reason of the breach of said warranty, was clearly admissible in order to enable the jury to determine the actual damages. Bierman v. City Mills Company, supra.

The judgment is affirmed, with costs.