# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

### B. F. STURTEVANT CO. v. CHAMPION FIBRE CO.

(Circuit Court of Appeals, Sixth Circuit. April 12, 1916.)

No. 2712.

1. SALES ⚷445(4)—BREACH OF WARRANTY—SUFFICIENCY OF EVIDENCE.

In an action on a written warranty of a draft-inducing apparatus, evidence as to the tests of the apparatus *held* not to show that its failure to produce the guaranteed power was due to the insufficient supply of coal, instead of the insufficient draft, so conclusively as to require a directed verdict for defendant.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1306; Dec. Dig. ⚷445(4).]

2. SALES ⚷445(4)—BREACH OF WARRANTY—DEFENSES—MISREPRESENTATION BY BUYER.

The inaccuracy of information furnished to a seller, who installed a draft-inducing apparatus, does not authorize a directed verdict for it in an action on the warranty, where its manager admitted that it did not prevent making an apparatus of the warranted power.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1306; Dec. Dig. ⚷445(4).]

3. SALES ⚷442(3)—BREACH OF WARRANTY—MEASURE OF DAMAGES.

The measure of damages applicable to actions for fraud in inducing sales of personal property, which allows recovery of the difference between the purchase price and the actual value, does not apply to an action for breach of an express warranty.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1286; Dec. Dig. ⚷442(3).]

4. APPEAL AND ERROR ⚷882(13)—PRESENTING QUESTIONS BELOW—INSTRUCTIONS—MEASURE OF DAMAGES.

In an action for the breach of an express warranty of a draft-inducing apparatus, where defendant offered no evidence as to the cost of making the apparatus conform to the warranty, and objected to evidence on that issue offered by plaintiff, which evidence showed that such cost would exceed the damages allowed defendant by the jury, and defendant's only theory as to the measure of damages was the erroneous one that it was the difference between the purchase price and the actual value, defendant cannot complain that the court instructed the jury that the measure of

---

damages was the difference between the value if it had been as warranted and the actual value.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3603; Dec. Dig. ☞882(13).]

5. EVIDENCE ☞543(4)—OPINION EVIDENCE—COMPETENCY OF EXPERT—VALUE OF MACHINERY.

In an action for the breach of an express warranty of a draft-inducing apparatus, a consulting engineer of education and experience, who had bought 16 induced-draft apparatuses, including one of the type made by defendant, one of which he bought within 60 days of the trial, and the others within one year of the purchase by plaintiff, is competent to testify as to the actual value of the apparatus, and as to its value if it had been as warranted, though he had not bought an apparatus with that particular type of engine, and did not know how many pounds of structural steel were in it, nor what parts were to be put up by defendant and what by plaintiff, which facts were stated in the contract.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2358; Dec. Dig. ☞543(4).]

6. SALES ☞442(10)—BREACH OF WARRANTY—DAMAGES—INTEREST.

Interest does not as a matter of law follow a claim for unliquidated damages for breach of warranty of machinery to be installed by defendant.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1293; Dec. Dig. ☞442(10).]

7. APPEAL AND ERROR ☞1140(5)—DISPOSITION OF CASE—MODIFICATION OF JUDGMENT—REMISSION OF INTEREST.

Where the only evidence as to the damages under the measure submitted by the court fixed it at about $5,000, and the verdict was for an amount which would be $5,005, with interest to the time the jury were instructed to allow interest on defendant's counterclaim, it was reasonably clear that the verdict was for that amount and interest, and plaintiff, who was not entitled to interest, can remit the amount of it to avoid a reversal of the judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4467; Dec. Dig. ☞1140(5).]

8. APPEAL AND ERROR ☞1052(5)—HARMLESS ERROR—ADMISSION OF EVIDENCE —CURE BY VERDICT.

Error, if any, in admitting, in an action for breach of warranty, evidence as to the breakdowns of the draft-inducing apparatus, which evidence was restricted by the court to how it affected the power of the apparatus, and was not referred to in the charge, except in connection with claims for damages which were not allowed by the jury, was not so prejudicial as to require a reversal, especially where the verdict was for the amount established by the only evidence on the claim for damages allowed by the jury.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4175; Dec. Dig. ☞1052(5).]

In Error to the District Court of the United States for the Southern District of Ohio; John E. Sater, Judge.

Action by the Champion Fibre Company against the B. F. Sturtevant Company to recover damages for breach of warranty. Judgment for plaintiff, and defendant brings error. Reversed, and new trial ordered, unless the plaintiff shall remit a portion of the judgment.

Cobb, Howard & Bailey and Henry L. Rockel, all of Cincinnati, Ohio, for plaintiff in error.

C. D. Robertson and C. B. Matthews, both of Cincinnati, Ohio, for defendant in error.

Before KNAPPEN and DENISON, Circuit Judges, and KILLITS, District Judge.

KNAPPEN, Circuit Judge. Plaintiff below (defendant in error here) sued for alleged breach of guaranty in a contract for installation of certain mechanical apparatus. There was trial by jury, resulting in verdict for plaintiff and judgment thereon.

Plaintiff was engaged, at Canton, N. C., in manufacturing wood pulp and paper. Its plant contained 20 boilers, each of 316 rated H. P., thus aggregating 6,320 B. H. P. The boilers were arranged in two series of 10 each, each furnace having V-shaped grates whose projected area was 8 feet by 7 feet, fed by automatic stokers. To aid in producing power and to save fuel, the hot gases from the furnace passed through economizers (of which there were four). Each economizer consisted of an inclosure containing a series of feed water pipes, arranged in sections, through which inclosure the hot gases from the furnaces passed, thereby considerably heating the water before it entered the boilers. These economizers had been supplied, but not installed, by defendant. The plant had but one stack. An enlargement of the plant requiring increased power and thus increased draft, plaintiff contracted with defendant for delivery and installation, at a price of $9,995, of a specified induced-draft apparatus, to work in connection with plaintiff's boilers, grates, stokers, and economizers. This draft-inducing apparatus consisted of four engines of specified type and dimensions, having a normal speed of 400 R. P. M., each engine operating a fan of given type and size for delivering the gases to and operating in connection with the stack, there being one upper fan and one lower fan for each of the two series of furnaces and boilers. The guaranty was in this language:

"We guarantee this apparatus under the above working conditions, to furnish sufficient draft to develop 10,000 B. H. P., it being understood that 1 B. H. P. will require not over 4¼ pounds of coal."

The draft-inducing apparatus was installed in June, 1909, before the enlargement of the plant. About October, 1910 (after the plant was enlarged), plaintiff, believing that the guaranteed 10,000 B. H. P. was not furnished, made a test of the plant, at which defendant was not represented. On November 30th and December 1st following, a two days' test was had, at which defendant was represented by a mechanical expert; at this test less than 8,000 H. P. seems to have been developed. Defendant did not accept this as a convincing test, and on July 1, 1911, a ten-hour test was had, at which defendant was represented by another mechanical expert. It is undisputed that at this last test only about 7,800 B. H. P. was developed.

Upon the trial plaintiff gave evidence regarding the first test, and both parties presented testimony as to the second and third tests. The first two tests seem not to have been regarded by either party as entirely adequate, and the conflict centered generally upon the conclusiveness of the test of July 1, 1911, the ultimate meritorious question being reduced to this: Whether defendant furnished draft enough to burn coal enough to produce the required power, or whether the

failure to produce more power was due to the delivery of insufficient coal upon the furnace grates. Plaintiff insisted that it delivered upon the grates all or substantially all the coal the draft supplied would burn; defendant insisted that it furnished more than enough draft to consume the coal required to develop the 10,000 B. H. P.

At the conclusion of the testimony defendant moved for directed verdict in its favor, which was denied, and the question of fact whether the guaranty was fulfilled was submitted to the jury, with instructions that the measure of plaintiff's general damages (in case of breach of the guaranty) was the difference between what the induced-draft apparatus was worth as actually delivered and what it would have been worth if as guaranteed. Such difference was found by the jury to be $6,080, and the general verdict was for this amount less an established counterclaim. Judgment was entered for the difference between these sums, after correction by the addition of interest upon the counterclaim. Plaintiff's claims for special damages for loss of power in the engines and for fuel and heat loss were submitted to the jury, but wholly disallowed.

[1] 1. The most prominent ground of the motion to direct verdict was that the evidence did not reasonably tend to show that the failure to develop the required boiler horse power was due to the insufficiency of the induced-draft apparatus. Disregarding the first two tests, if it be assumed that the test of July, 1911, was suitable for developing the maximum capacity of the plant, the fact that the guaranteed 10,000 B. H. P. was not developed has a tendency to show the ineffectiveness of the apparatus. There was express and direct testimony that the test was suitable for developing the maximum capacity, and that, although the fans were run at a speed in excess of 400 R. P. M., they produced insufficient suction, due to the obstruction to the draft by the economizers, and loss in draft in the flues through collision of the gases owing to alleged improper pitch of the fans. True, there was testimony on defendant's part that the test in question was insufficient; that a satisfactory test would require a much longer preparation than was had; and that the conditions under which the test was made were unfavorable to accuracy in several respects, including failure to "blank" the valves of certain pipes leading into the boilers, an inaccurate meter, an improper pump, and exposure to the weather of steam pipes leading from the boilers to the engines operating the fans. But these criticisms of the conditions surrounding the test presented only questions of fact for the jury, in view not only of the express testimony by experts that the conditions were suitable to develop maximum capacity, and that the exposure of the steam pipes to the weather (the out-door temperature being 100 degrees) caused a drop in pressure of no more than 4 to 6 pounds between the boilers and the fan engines, but also of testimony that defendant's expert approved everything that was done.

Defendant denies that the "collision of gases" impaired the draft, and insists, moreover, that its contention that the failure to develop the required power was due to the feeding of an insufficient amount of coal is shown to a demonstration by undisputed tests, and that the verdict is thus opposed to established physical facts. The amount of

coal actually burned during the test was between 21 and 23 pounds per square foot of grate surface per hour, or about $3^1/_{10}$ pounds per boiler horse power developed. There was testimony on defendant's part that the carbon dioxide test of the flue gases showed that there was furnished about 25 pounds of air per pound of coal burned, and that in practice 15 pounds of air per pound of coal is enough; that the amount of air so furnished would have burned 30 pounds or more of coal per square foot, producing more than 10,000 B. H. P., the amount keeping within the maximum of coal consumption recognized by the guaranty; that the draft furnished (about $^{16}/_{100}$ of an inch) was sufficient to burn this required amount of coal; that the burning of an insufficient amount of coal was shown by the small percentage of coal in the ash, as well as by the alleged fact that during the test the coal was completely burned out by the time it reached seven-eighths or less of the full travel of the grates; and that the automatic stokers employed were incapable, without coarser gearing, of supplying more coal than actually delivered to the grates. But the testimony that the coal was consumed before completing its travel was disputed; there was testimony tending to show that the carbon dioxide test indicated no greater excess of air than accorded with actual everyday practice, made necessary to prevent loss of heat energy through the formation of carbon monoxide; that the $^{16}/_{100}$ inches of draft produced was not ordinarily enough to burn 30 pounds of coal per square foot of "fair grade of coal"—that at least $^{22}/_{100}$ inches was required to produce the rated boiler horse power (6,320), and more in proportion to meet the "overload"—it appearing that defendant's published table of the "relation of draft and rate of combustion" gave $^{26}/_{100}$ inches of furnace draft as "required to burn 22 pounds of dry coal per hour per square foot of grate," and that the feeding of the coal, which was shovelled by hand into the magazines (instead of being automatically delivered from the bunkers), was accelerated by hand-cranking. It also appeared that defendant's expert made no claim during the test of an insufficient feeding of coal. And while one or more of plaintiff's witnesses admitted that there was draft sufficient to have burned some more coal than was burned, the testimony taken together was sufficient to support a finding that the draft was insufficient to burn coal enough to produce the guaranteed horse power; and upon the motion to direct verdict, the testimony must be viewed most favorably to plaintiff.

The proposition that plaintiff failed to show that its boiler system produced 6,320 B. H. P. before the draft-inducing apparatus was installed needs no special consideration. Some evidence of the fact is found in the undisputed testimony that the accepted rate of boiler horse power is based upon an allowance of one horse power for each square foot of heating surface in the boiler, and defendant presumably so understood in making its guaranty.

[2] The alleged inaccuracy of certain information as to the existing draft, furnished by plaintiff, did not justify a direction of verdict for defendant, especially in view of the admission of defendant's manager that it did not influence the making of a plant of the required power.

The motion for directed verdict was properly denied.

[3, 4] 2. Defendant contends that the measure of plaintiff's general damages for breach of the guaranty is not as the jury was instructed, viz.: The difference between the value of the machinery as delivered and its value if as warranted, but the difference between the purchase price and the actual value. The latter is the measure ordinarily applied in actions for fraud and deceit in inducing sales of personal property.[1]

The measure adopted by the trial court is accepted by the leading text-writers as generally applied in actions by the vendee of personal property which has been paid for in full (as is the case here) for breach of an express warranty of capacity or quality. 3 Sutherland on Damages (3d Ed.) § 670; 2 Mechem on Sales, § 1817; Williston on Sales, § 613; Benjamin on Sales (7th Ed.) p. 962. The rule stated is supported by numerous decisions of state courts generally.

The Supreme Court of the United States has not, so far as we have found, in terms either adopted or rejected the rule as applied in the instant case. In several cases, however, the measure applied "as the only one accomplishing full and exact justice to both parties" has been held to be "the reasonable cost of altering the construction and setting of the machinery so as to make it conform to the contract." Benjamin v. Hillard, 23 How. 149, 167, 16 L. Ed. 518; Marsh v. McPherson, 105 U. S. 709, 717, 718, 26 L. Ed. 1139; Stillwell & Bierce Mfg. Co. v. Phelps, 130 U. S. 520, 526, 527, 9 Sup. Ct. 601, 32 L. Ed. 1035; Pullman Car Co. v. Metropolitan Ry. Co., 157 U. S. 94, 111, 15 Sup. Ct. 503, 39 L. Ed. 632.

In the United States Courts of Appeals the rule is not uniform. For example: In the Circuit Courts of Appeals of the Fifth, Seventh, Eighth, and Ninth Circuits the measure has been held to be the difference between the value as delivered and the value as warranted.[2]

On the other hand, in the Circuit Court of Appeals for the First Circuit the applicable measure has been held to be the actual cost of supplying the defects. Nashua Iron & Steel Co. v. Brush, 91 Fed. 213, 215, 33 C. C. A. 456. In that case, however, there was no express warranty, and the rule adopted was not in terms declared exclusive. We have not attempted a complete examination of the decisions in the various circuits. In this court the question has not been definitely passed upon. The nearest approach is in Thomas China Co. v. Ray-

[1] Smith v. Bolles, 132 U. S. 125, 10 Sup. Ct. 39, 33 L. Ed. 279; Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113; Simon v. Goodyear Co. (C. C. A. 6th Cir.) 105 Fed. 573, 579, 44 C. C. A. 612, 52 L. R. A. 745; Hindman v. Bank (C. C. A. 6th Cir.) 112 Fed. 931, 50 C. C. A. 623, 57 L. R. A. 108; Chesbrough v. Woodworth (C. C. A. 6th Cir.) 195 Fed. 875, 885, 116 C. C. A. 465.

[2] English v. Spokane Commission Co. (C. C. A. 9th Cir.) 57 Fed. 451, 456, 6 C. C. A. 416; McDonald v. Kansas City Bolt & Nut Co. (C. C. A. 8th Cir.) 149 Fed. 360, 365, 79 C. C. A. 298, 8 L. R. A. (N. S.) 1110; Crane Co. v. Columbus Construction Co. (C. C. A. 7th Cir.) 73 Fed. 984, 991, 20 C. C. A. 233; The Nimrod (D. C.) 141 Fed. 215, 217 and (C. C. A. 5th Cir.) 141 Fed. 834, 72 C. C. A. 300 (but see Vulcan Iron Works v. Roquemore [C. C. A. 5th Cir.] 175 Fed. 11, 16, 99 C. C. A. 77). See, also, Boiler & Tank Co. v. Columbus Mach. Co. (C. C. A. 3d Cir.) 55 Fed. 451, 453, 5 C. C. A. 190; Cleveland Co. v. Buchanan & Sons (C. C. A. 2d Cir.) 120 Fed. 906, 910, 911, 57 C. C. A. 498.

mond Co., 135 Fed. 25, 28, 67 C. C. A. 629, where a recovery by the vendee of the expense incurred in putting the machinery in condition called for by the contract (and for which amount only it sued) was approved.

We do not think the record such as to require us to decide whether the rule adopted by the District Court is generally applicable to suits by a vendee for breach of a guaranty of quality or capacity of machinery. There was no testimony that the alleged defective apparatus could be readily made good, as was the case in Pullman Car Co. v. Metropolitan Ry. Co., supra. On the contrary, one of plaintiff's witnesses testified that the plant could be changed so as to produce 10,-000 H. P. only by the installation of new equipment, and (under defendant's objection of irrelevancy) that the cost thereof would be $13,-000. Later, another of plaintiff's witnesses testified that nothing could be done with the apparatus to make it accomplish the guaranteed result and (under defendant's objection) an offer to show that it would cost "with that boiler plant" $13,000 to produce 10,000 H. P. was rejected.

There was no other testimony as to the cost of making the apparatus conform to the guaranty, except that defendant, while offering no proof of such cost, gave testimony that no changes in the apparatus were necessary, and that changes not connected therewith (as in the stoker feed) were alone needed to develop the guaranteed capacity. The court called on defendant's counsel to suggest some rule of damages other than the one announced on the trial and afterwards applied in the charge. Defendant contended for no rule except that embodied in its request and urged here, viz.: The difference between the purchase price and the actual value. In this court, again, the latter is the only rule advocated by defendant, its brief admitting that the rule applied below is the "usual rule," although it is said not to be applicable to conditions presented here. The rule applicable to deceit cases manifestly does not apply to actions for breach of express warranty. In the former class of cases, as said in Smith v. Bolles, supra, "what the plaintiff might have gained is not the question; but what he had lost by being deceived into the purchase." In the latter class of cases the vendee is entitled to the benefit of a profitable contract. "The amount that would have been received, if the contract had been kept, is the measure of damages if the contract is broken."[3] Full compensation to the injured vendee is what is aimed at. It is enough to hold, as we do, that defendant's requested measure of damages was properly rejected, and that as the case stood defendant is not in position to complain of the measure adopted.

[5] The objection to the competency of plaintiff's sole witness as to the respective values of the apparatus as furnished and as warranted is not well taken. The witness was a consulting engineer of education and experience; he had bought 16 induced-draft apparatus, including one or more of the Sturtevant type. He had bought one outfit within 60 days of the trial below, and had bought others in 1909. He was

___

[3] Expression in Alder v. Keightly, 15 M. & W. 117, quoted in Benjamin v. Hillard, supra. See, also, Benjamin on Sales (7th Ed.) p. 962.

not rendered incompetent to testify from the fact that he had never bought a Sturtevant outfit with a compound engine, nor from the fact that he did not know exactly how many pounds of structural steel there were in the apparatus in question, nor precisely what parts of the structure were to be put up by defendant and what parts by plaintiff. He had general knowledge and experience on the subject; the contract provided generally what was to be furnished by each of the parties, and the testimony was not subject to the objection that it was based upon mere conjecture. He had seen the figures, and "that is all any engineer goes by."

[6] 3. The jury found the difference between the value of the apparatus as delivered and its value if as represented, to be $6,080. Defendant assails this verdict as excessive. The only testimony upon the subject by way of definite figures gives the value as delivered as about $10,000, and if as represented about $15,000, a difference of about $5,000. The verdict is thus excessive unless it may be thought properly to include either plaintiff's expense incurred in making the test of the apparatus or interest upon the damages measured by the difference in value stated. While the court submitted the question of expenses of the test, we think the language of the jury's verdict negatives its inclusion. The damages being unliquidated interest did not follow as matter of law. Illinois Surety Co. v. United States (C. C. A. 4th Cir.) 215 Fed. 334, 340, 131 C. C. A. 476; Stephens v. Phœnix Bridge Co. (C. C. A. 2d Cir.) 139 Fed. 248, 250, 71 C. C. A. 374. The question of interest was not submitted to the jury's discretion as part of the damages, and the natural inference is that the jury supposed interest followed as matter of law, and so improperly included it.

[7] The question is whether, as defendant contends, the judgment should be reversed on this account, or whether the case is a proper one for allowing plaintiff to remit. The test is whether it is reasonably clear what the jury intended to find as the measure of plaintiff's damages without interest. If this is clear, the case is a proper one for allowing remittitur (in case no other reversible error is found); otherwise not. See decisions of this court cited in the margin.[4]

We think it apparent that the award was intended to be $5,000 (or possibly $5,005), as the difference between the purchase price of the apparatus and its value if as represented, plus interest thereon. There was no testimony of value except as just stated, and the jury presumably found accordingly. $1,080 is 3 years 7 months and 6 days' interest at 6 per cent. on $5,000, and $1,075 is exactly 3 years and 7 months' interest on $5,000. The undisputed testimony is that the enlargement of plaintiff's plant was completed in May or June, 1910. The trial below occurred in February, 1914. The court instructed the jury to allow interest on defendant's counterclaim to February 3, 1914. From July 1, 1910, to February 3, 1914, is 3 years 7 months and 2 days. We have no reasonable doubt that the jury intended to find

---

[4] Huebel & Co. v. Leaper, 188 Fed. 769, 774, 110 C. C. A. 475; Mosby v. United States, 194 Fed. 346, 351, 116 C. C. A. 74; N. Y. C. & St. L. R. R. Co. v. Niebel, 214 Fed. 952, 957, 131 C. C. A. 248; Pennsylvania Co. v. Sheeley, 221 Fed. 901, 906, 137 C. C. A. 471; Chesbrough v. Woodworth, 195 Fed. 875, 116 C. C. A. 465; Id., 221 Fed. 912, 916, 137 C. C. A. 482.

the value without interest as either $5,000 or $5,005, and included the balance for interest.

[8] 4. The trial court admitted, against defendant's objection, certain testimony that the engines operating the fans had in their earlier use more or less breakdowns calling for repairs, and that one of the engines became completely demolished; also a photograph of one of the engines in a brokendown condition; also testimony that defendant's employé in charge of the installation of the fan system on the occasion of a little breakdown, in answer to a question whether they "usually gave that much trouble," said that "under the conditions here" he thought they would; and on another occasion that "he didn't think they would ever give satisfaction the way they was put up."

Assuming, for the purposes of this opinion (but without so deciding), that none of this testimony was admissible, the question is—is it to be presumed to have been so far prejudicial as to require reversal of the judgment? The trial court seems to have had doubts of the competency of the testimony under the pleadings, and expressed the view that it should be "restricted to how it affected the power of the apparatus." The most definite theory on which it seems to have been offered was that the breakages were due to vibration. Although defendant moved at the close of the evidence to strike out considerable testimony, the testimony now in question was not included in the motion. It was not referred to in the charge, except as the subject of breakages was mentioned in connection with instructions on the subject of damages for expenses incurred by way of loss from operation, and by reason of loss in fuel by keeping the by-passes open; both of which elements of damage were rejected by the jury. Upon the question of general damages found by the jury, measured by the difference between the value of the plant as furnished and what it would have been if as warranted, the relevancy of the testimony in question would have been quite remote, especially in view of the fact that the only testimony as to such difference placed the value of the apparatus as delivered at about $10,000, which was in fact $5 more than the contract price. In view of the jury's rejection of the two classes of special damages mentioned, and its express confining of the damages to the difference in value stated; the fact that when the test of July, 1911, was made the fans were running at a speed exceeding that specified in the contract, and that the court in commenting upon the evidence of breakages before referred to stated that the "evidence shows that all four of the fans and the engines were running at that time;" the fact that the case practically turned at the last upon the question whether the failure to produce the required power was due to insufficient fuel or to lack of draft, we think a presumption that the testimony mentioned affected the verdict would unwarrantably discredit the jury's intelligence, and that the error in receiving the testimony (if there was error) is not so vital as to justify reversal.

Questions of evidence and instructions relating to the two classes of special damages rejected by the jury are of course out of the case.

There was no error in the charge on the subject of plaintiff's alleged acceptance of the apparatus. Other errors are alleged, and while we have not discussed all of them, we have considered all argued by

defendant's counsel, and find no prejudicial error except as respects the excess in the verdict.

For this error the judgment will be reversed and a new trial ordered, unless the plaintiff below sees fit to remit from its judgment $1,080 as of the date of the judgment. If within 30 days plaintiff files here the certificate of the clerk of the district court that such remittitur has been there filed, the judgment as so reduced will be affirmed. In either event, plaintiff in error will recover costs of this court.