## HENDERSON v. PLYMOUTH OIL CO.
### (FARQUHAR, Intervener).

(District Court, W. D. Pennsylvania. June 22, 1926.)

### No. 1426.

**1. Fraud ⟨⟩59(3)—Measure of damages for deceit is pecuniary loss, determined by deducting from value of consideration paid value of thing obtained.**

Measure of damages in action for deceit based on fraudulent misrepresentation is actual pecuniary loss sustained, determined by deducting from value of consideration paid value of thing obtained, and not by substracting actual value of thing obtained from value had representations been true.

**2. Fraud ⟨⟩25.**

Where value of stock at time of purchase exceeded price paid, no damages can be recovered for fraudulent representations.

**3. Corporations ⟨⟩120.**

Misrepresentations by promoter that capital stock of corporation did not exceed certain number of shares *held* not to amount to warranty under law of Pennsylvania.

**4. Corporations ⟨⟩120.**

Uniform Sales Act Pa. 1915 (P. L. 543; Pa. St. 1920, §§ 19649–19726), broadly defining warranty, does not apply to sales of corporate stock.

**5. Corporations ⟨⟩133—Misrepresentations of promoter as to capitalization of company, creating no legal liability against him, held no consideration for transfers of shares to purchasers, authorizing equity to consummate transfer.**

Where false representations of promoter as to capitalization of corporation created no legal liability against him, transfer of shares to purchasers because of such misrepresentations did not rest on good consideration, so that court of equity would consummate transfer by remedy equivalent to mandatory injunction.

**6. Corporations ⟨⟩117—Transfer of part of stock as agreed by promoter, as evidence of good faith, because of having made false representations, did not preclude right to revoke because transaction was consummated.**

Where promoter agreed to transfer 250,000 shares to purchasers because of having made false representations, transfer of 50,000 shares as evidence of good faith did not preclude right to revoke transfer on ground that it was fully consummated transaction.

**7. Contracts ⟨⟩95(5)—Court of equity will rescind transaction compelled by threats of arrest, where threatened party feared imminency of imprisonment, although threats were not of unlawful imprisonment.**

Court of equity will rescind transaction compelled by express threats of immediate arrest, where threatened party feared imminency of imprisonment, and transfer would not have been voluntarily made without such coercion, even though threats were not of unlawful imprisonment.

**8. Contracts ⟨⟩95(1).**

Contract produced by actual intimidation is voidable, not only where circumstances were sufficient to intimidate man of ordinary firmness, but were sufficient to and did intimidate particular person coerced.

**9. Contracts ⟨⟩95(5).**

Law will not tolerate employment of criminal process for enforcement of civil liability.

**10. Corporations ⟨⟩116.**

Transfer of shares of stock by promoter to purchasers, to whom he was alleged to have made misrepresentations, *held* to have been obtained through duress and coercion, compelled by fear of arrest and imprisonment.

In Equity. Suit by William M. Henderson against the Plymouth Oil Company, wherein Jerome G. Farquhar intervened. Decree dismissing the bill, and in favor of intervener.

Thorp, Bostwick, Stewart & Reed, of Pittsburgh, Pa., and Owen Roberts, of Philadelphia, Pa., for plaintiff.

John W. Davis, of New York City, and Weller, Wicks & Wallace and Alter, Wright & Barron, all of Pittsburgh, Pa., for defendant.

THOMSON, District Judge. This case is of much importance, by reason of the amount involved, and calls for a careful consideration of the evidence, and a discriminating application of certain legal and equitable principles of the facts as the court finds them to be.

The bill is filed by William M. Henderson, a citizen of Pennsylvania, against the Plymouth Oil Company, a corporation of the state of Delaware, to compel the company to transfer to him, on its books, 50,000 shares of the common stock, of which plaintiff claims to be the owner by assignment for value from Jerome G. Farquhar, together with all dividends declared and remaining unpaid thereon; the certificates for the stock having been indorsed and delivered to the plaintiff at the time of the assignment, on June 26, 1925.

The plaintiff, averring that he formally tendered the certificates to the company on December 9, 1925, requesting the transfer to him of the stock upon the books, which the company refused, filed this bill for a remedy in the form of a mandatory injunction to compel such transfer. The plaintiff further seeks a judgment against the company for the amount of dividends declared and payable on said stock, which amounted at the time of the trial to $187,500. The bill further avers that this tender was made after December 9,

1925, at which time a certain restraining order, issued by the Chancery Court of Delaware, for New Castle county, prohibiting the company from making transfer on its books or paying any dividends on its stock, was dissolved.

The Plymouth Oil Company, by way of answer, asserts that Farquhar is the record owner and holder of the stock in question, and has given the company notice that he is the true and legal owner of the same, with all dividends declared and unpaid thereon; that the company and its officers had been notified by Farquhar that the transfer set forth in the bill had been effected by duress and fraud, and that no legal assignment resulted from such transfer, and that he would hold the company responsible should it permit a transfer of the stock to the plaintiff. The answer further averred that the company was a mere stakeholder as between the parties, and stood ready to register as owner the claimant whom the court should find entitled thereto, holding the dividends in its treasury ready for payment to such party. The answer also prayed that Farquhar be permitted to intervene as a party defendant.

The court, on petition, permitted Farquhar to intervene as a defendant, and the latter answered the bill, charging that the plaintiff, in concert with others named, in pursuance of a conspiracy, wrongfully obtained the certificates in question by threatening the defendant with arrest and imprisonment upon certain criminal charges, of which he was innocent, and that solely by reason of such coercion, and without other consideration, the defendant Farquhar assigned to plaintiff the certificates described in the bill.

Plaintiff, in reply, denied any coercion, duress, fraud, or deceit in the transaction; averred that, while certain informations were made against Farquhar, they were well founded in fact and in law, the defendant having committed the offenses therein charged against him. The plaintiff further replied that the transfer in question was the free and voluntary act of Farquhar, and was for a good and valuable consideration, the plaintiff and others having been induced to purchase their stock through the false and fraudulent representations of Farquhar that the authorized capital stock of the corporation was 350,000 shares of common stock, whereas in truth the outstanding capital stock of the corporation was 1,050,000 shares; that subsequently the said Farquhar, admitting the falsity of the said representations, promised and agreed to obtain and deliver to the plaintiff and others associated with him enough stock so that two shares should be given to the plaintiff and those associated with him for each share then held by him; that in pursuance of this arrangement and agreement the certificates for the 50,000 shares described in the bill were delivered to the plaintiff, who holds the same for himself and others, the same being delivered for a good and valuable consideration, without duress or fraud, and because of Farquhar's false and fraudulent representations to the plaintiff and others as aforesaid.

Thus the issues of law and fact are joined between the parties. In relation to the organization and holdings of the Plymouth Oil Company, the following facts may be stated:

One Frank T. Pickrell and associates were the owners of certain contracts for oil and gas purposes, embracing 12 sections, aggregating 10,240 acres, in Pecos and Upton counties, Tex., upon which they had drilled one producing oil well. When the first well was completed, they commenced the drilling of two other wells called for in their contracts; but, besides these, they were required to drill at least four additional wells. After expending a very considerable sum of money, Pickrell and his associates, finding themselves unable to proceed with the drilling operations necessary to perfect their leases, interested certain Pittsburgh parties in the enterprise, designated hereafter as promoters, consisting of L. M. Benedum and associates; one Edward C. Stearns being their representative. Pickrell, on the one hand, and Stearns, representing the promoters, on the other, agreed upon terms which were embodied in a contract known as the Pickrell contract, dated October 5, 1923. Under this contract, Pickrell and associates agreed to sell, and Stearns to buy, a three-fourths interest in the aforesaid 12 sections. The three-fourths interest, which Stearns acquired, and the one-fourth interest retained by Pickrell, were to be secured through a corporation to be formed, known as the Big Lake Oil Company. To this corporation Stearns was to transfer all of his rights under the contract, in consideration of three-fourths of its capital stock; one-fourth being held by Pickrell. It was agreed that Stearns should pay for this three-fourths interest $200,000, in cash and notes, and an additional sum sufficient to repay the Pickrell interests the amount theretofore expended in the drilling of the two uncompleted wells, convey one-fourth of the capital stock of the Big Lake Oil Company, complete the two wells then

drilled, and drill within the stipulated time, at his own expense and not that of the company, four additional wells. It appears that the estimated sum necessary to make such refund and to drill the four additional wells was $250,000. Stearns thus obligated himself to pay or expend in cash the sum of $450,000.

To effectuate this purpose, two corporations, the Big Lake Oil Company and the Plymouth Oil Company, were formed in October, 1923, under the laws of the state of Delaware. The former had an authorized capital stock of 400,000 shares, of the par value of $10 per share, and the latter a capital stock of 1,200,000 shares, of the par value of $5 per share. The stock of the Plymouth Oil Company consisted of 1,050,000 shares of common stock, and 150,000 shares of preferred. The preferred stock carried a preferred dividend of 7 per cent., and was convertible into common stock, with the right of redemption by the company at any time after January 1, 1926.

Apparently the purpose in incorporating the Plymouth Oil Company was to acquire the shares of the Big Lake Oil Company, which Stearns had purchased from Pickrell, and to assume Stearns' obligations to pay the cash and finance the drilling under the Pickrell contract. In October, 1923, Stearns offered to sell, and the Plymouth Oil Company agreed to buy, all the stock of the Big Lake Oil Company which Stearns held—that is, three-fourths of the company's capital stock —together with the oil and gas properties in Pecos and Upton counties aforesaid, in consideration of the issuance to Stearns of all its capital stock, or a total par value of $5,-250,000. This transfer being consummated, the 150,000 shares of preferred stock was transferred back to the corporation for the use of the company; the directors authorizing its sale at $3 per share to raise working capital.

Jerome G. Farquhar, defendant, was one of the promoters, and was treasurer and vice president of the Plymouth Oil Company from its incorporation, and was designated as trustee by the company for the sale of the preferred stock. The Plymouth Oil Company was duly registered to do business in Pennsylvania, with its office and principal place of business in Pittsburgh, where the corporate business is transacted, and where the stock registry books and all books of record are kept. The office of the company is also the office of the treasurer, Jerome G. Farquhar, and of the secretary, W. E. Huston.

Up to this point the facts of the case are clear. We now enter the field of serious conflict. The foundation of the plaintiff's case rests on alleged false representations made by Farquhar to William M. Henderson, the plaintiff, Albert R. Budd, Floyd B. Lockhart, and Wilbur J. Wilson, as to the outstanding capital stock of the Plymouth Oil Company at the time of their several purchases of stock. It is the position of the plaintiff and his associates, Lockhart, Budd, and Wilson, that they were deceived by the representations of Farquhar, who sold them the stock, that the outstanding capital stock was 350,-000 shares, whereas in truth the common stock outstanding was 1,050,000 shares, and that, acting under this belief, so induced by Farquhar's misrepresentations, their several purchases were made.

The plaintiff further avers that afterwards, on June 23, 1925, at the stockholders' meeting of the company, they learned for the first time the actual amount of the company's stock issue, and at that meeting, and at meetings with Farquhar, on the 24th, 25th, and 26th of June, Farquhar admitted his misrepresentation and deceit as to the capital stock, and agreed that he would make it right by giving the plaintiff and those associated with him, to whom the various representations had been made, two shares of stock for each share which they had purchased. They aver that it was further agreed that those who were thus entitled to be reimbursed held something less than 125,000 shares, which would require the turning over by Farquhar of nearly 250,000 shares; that in pursuance of this arrangement and agreement, and as an evidence of his good faith, Farquhar did turn over to the plaintiff on June 26th, 50,000 shares, being the stock in controversy in this suit, the remainder to be obtained and transferred by him to the plaintiff shortly thereafter, an extension of 10 days' time being granted him for that purpose. They aver that, having failed to comply with this agreement, on July 9th following, he was arrested on warrants previously sworn out, charging him with making a false statement as an officer of a corporation, and with false pretenses.

While the evidence does not disclose the motive which induced such misrepresentations by Farquhar as to the amount of the outstanding capital stock, and while it is true that the probabilities of the case—the fact that the actual capitalization seems to have been generally known at Charleston, W. Va., where much of the stock was held; that the charter, a public document, was incorpo-

rated in the minute book of the company kept in its office, a short distance only from the office of the plaintiff, and the practical certainty that the true situation must sooner or later become known to the plaintiff and his associates—these considerations, if the evidence were in any sense equally balanced, would turn the scales in Farquhar's favor. But I find the evidence so strongly preponderating as to practically compel the conclusion that such false representations were in fact made by Farquhar as claimed on behalf of the plaintiff.

While Farquhar flatly denied any such misrepresentations, as against his denial we not only have the positive testimony of Henderson, Lockhart, Budd and Wilson, but the strongly corroborative evidence of five others, men of standing and reputation in the business life of Pittsburgh, to whom similar representations were made during the same general period of time, and concerning the same subject-matter, viz. the amount of capitalization of the Plymouth Oil Company. From this finding of fact in the plaintiff's favor, and wholly aside from the question of duress, I will first inquire: What is the legal situation arising therefrom?

The plaintiff Henderson acquired stock through Farquhar by four separate purchases, during the period from January 21 to June 24, 1924, aggregating 64,214 shares, the last being a purchase of 30,000 shares under option, which option he accepted on the coming in of well No. 9. During the same general period, and on different dates, Budd purchased 26,628 shares, Lockhart 7,493 shares, and Wilson 6,334 shares. For each share of preferred stock, which they purchased, they received one share of common as a bonus.

Whatever may have been the actual or prospective value of the stock at the beginning, its value kept constantly increasing. Theoretically, the favorable reports of experts and practical oil operators enhanced the prospective value, while every incoming producing well enhanced the actual value. This was plainly apparent to the plaintiff and his associates, and recognition of the fact conclusively appears, not only by their retention of all their stock from the beginning, but by their repeated purchases from time to time as conditions became more favorable and the selling value of the stock advanced.

The actual value of the stock the evidence does not definitely show. Presumptively, the property was worth the par value of the stock which was issued for it, viz. $5,250,000, when the company was incorporated, and the property was comparatively developed. This was the judgment of the directors, and there is no evidence that they were in error. Some sales were made at $40 per share, and it appears that Huntley & Co. appraised the Big Lake properties, of which the Plymouth Company owned a three-fourths interest, at nearly $80,000,000. On this basis the Plymouth Company stock would be worth $57 a share. The immense earning value of the stock appears from the fact that from July 1, 1925, to April 1, 1926, 50,000 shares of stock in suit have accumulated dividends amounting to $187,500. When we reflect that the actual purchase price which plaintiff and his associates paid for their stock, including that received as bonus, was not over $1.50 per share, the phenomenal value of their investment is at once apparent.

In this situation, what legal liability arose against Farquhar in the plaintiff's favor? If any such existed, different remedies might have been pursued to redress the wrong. The plaintiff might have rescinded the contract on the ground of misrepresentations and fraud. But to rescind the status quo must be restored. The stock must be returned or tendered before an action would lie to recover the moneys paid. The plaintiff would not adopt this remedy, for the very obvious reason it would have stricken down a most valuable contract.

[1] The plaintiff might have sued to recover damages in an action of trespass for deceit. But in this he would have failed, as no damages were sustained. The remedy would have been appropriate and adequate, but the case would have failed on its merits; this by reason of the measure of damages applicable in such case. It is well settled by the decisions of the federal courts, by the Supreme Courts of Pennsylvania and Delaware, and by the great weight of authority in other courts, that, in an action for deceit based on fraudulent misrepresentations, the measure of damages is the actual pecuniary loss which the plaintiff has sustained, and this is determined by deducting from the value of the consideration paid the value of the thing obtained, not by subtracting the actual value of the thing obtained from its value had the representations been true.

A decisive case on this question is that of Smith v. Bolles, 132 U. S. 125, 10 S. Ct. 39, 33 L. Ed. 279. There plaintiff charged that defendant sold him certain shares of stock in a mining company at $1.50 per share, upon representations as to the value of the properties which would have made the

stock worth at least $10 per share. The action brought was for damages resulting from such misrepresentations. The lower court held that the measure of damages was the difference between the contract price and the reasonable market value of the property received, had it been as represented. This was held to be error. The Supreme Court pointed out that the gist of the action was the fraudulent inducement, for which such damages only could be recovered as naturally and proximately resulted therefrom. It was accordingly held that the proper measure was the difference between the value of the thing obtained and the price paid for it. The court said: "What the plaintiff might have gained is not the question, but what he had lost by being deceived into the purchase."

This case was followed by Sigafus v. Porter, 179 U. S. 116, 21 S. Ct. 34, 45 L. Ed. 113, in which the facts were substantially the same. Again the question of the proper measure of damages was raised and considered, and the Supreme Court in an elaborate opinion, in which the question was discussed on principle, with an extended review of the authorities, followed and reaffirmed the rule of Smith v. Bolles. The same rule was followed in Rockefeller v. Merritt, 76 F. 909, 22 C. C. A. 608, 35 L. R. A. 633, Wilson v. New U. S. Cattle Ranch Co., 73 F. 994, 20 C. C. A. 241, Kell v. Trenchard, 142 F. 16, 73 C. C. A. 202, Hindman v. First National Bank, 112 F. 931, 50 C. C. A. 623, 57 L. R. A. 108, and Pittsburgh L. & T. Co. v. Northern Co. (C. C.) 140 F. 888, a decision by the Circuit Court for this district.

The rule laid down in Smith v. Bolles has been steadily followed in Pennsylvania, in which the leading case is High v. Berret, 148 Pa. 261, 23 A. 1004. This was an action for damages for deceit in the sale to plaintiff of mining stock; it being alleged by plaintiff that certain misrepresentations and false statements as to the value of the properties owned by the mine were made by the defendant. The trial judge corrected the verdict by requiring the plaintiff to remit so much of the amount found by the jury as represented the sum which the plaintiff would have gained, had the representations been true, allowing the verdict to stand for the difference between the value of the property which the stock represented and the price paid for the stock. To the same effect is O'Rourke v. Blocksom, 69 Pa. Super. Ct. 93; Curtis v. Buzard, 254 Pa. 61, 98 A. 777; Browning v. Rodman, 268 Pa. 575, 111 A. 877. In Browning v. Rodman, decided in 1920, the Supreme Court said: "The measure of damages suffered by one who is fraudulently induced to make a contract of sale, purchase, or exchange of properties is the difference between the actual value of that which is parted with and the actual value of that which he receives under the contract."

[2] It has been recently held by the Supreme Court of Delaware that, in an action for damages arising by reason of misrepresentations made to the plaintiff at the time he purchased in Pennsylvania the stock in a Delaware corporation, the Pennsylvania law as to the measure of damages is to be applied. Williams v. Beltz, 7 Boyce (30 Del.) 360, 107 A. 298. The value of the stock at the time it was purchased, exceeding the price paid for it, legally precluded any recovery of damages by the plaintiff in an action for deceit.

[3] Another remedy is sometimes open in case of a sale of goods. In Sturtevant v. Champion Fibre Company, 232 F. 1, 146 C. C. A. 193, Judge Knappen held that, while the foregoing rule as to the measure of damages applies in actions of tort for deceit, if the representations alleged to be false amount to a warranty, the plaintiff may elect to sue as for breach of contract. In such case the measure of damages has been held to be the difference between the actual value of the thing purchased and the value it would have had, had it been as warranted. In such action, the question would be: Did the words used constitute a warranty? The misrepresentations by Farquhar that the capital stock of the Plymouth Company was 350,000 shares, or could never exceed 350,000 shares, do not amount to a warranty under the law of Pennsylvania, which governs the case.

In the leading case of McFarland v. Newman, 9 Watts, 55, 34 Am. Dec. 497, the court below had held "that a positive averment, made by the defendant at the time of the contract, is a warranty." The case was reversed on this question; Chief Justice Gibson saying: "As the cause goes back to another jury, it is proper to intimate the principle on which a correct decision of it must depend. Though to constitute a warranty requires no particular form of words, the naked averment of a fact is neither a warranty itself, nor evidence of it. In connection with other circumstances, it certainly may be taken into consideration; but the jury must be satisfied from the whole that the vendor actually, and not constructively, consented to be bound for the truth of his representations." See, also, Jackson v. Wetherill, 7 Serg. & R. 480; Wetherill v. Neilson, 20

Pa. 448, 54 Am. Dec. 741; Holmes v. Tyson, 147 Pa. 305, 23 A. 564, 15 L. R. A. 209; Walker v. Kirk, 72 Pa. Super. Ct. 534.

In the Jackson v. Wetherill Case, a horse was represented as safe, kind, and gentle in harness, when the party making the representations knew that the horse was wild and unsafe. The lower court held the representation constituted a warranty, the breach of which entitled plaintiff to recover in an action for damages. The Supreme Court, in reversing, said: "It is the case of a representation, and, if made with the knowledge of its falsehood, would render the party liable in an action of deceit, but not in assumpsit on the warranty."

[4, 5] The cases in Pennsylvania clearly establish that the mere affirmation of a fact, though made at the time of the sale and although relied upon by the purchaser, is not a warranty. Either actually or constructively the vendor must have consented to be bound by his representations. It is the difference between an affirmation and a promise. The Uniform Sales Act of 1915 (P. L. 543; Pa. St. 1920, §§ 19649–19726), broadly defining warranty, is not applicable, as that act does not apply to the sales of stock. This was recently decided by the Supreme Court of the State in the case of Guppy v. Moltrup, 281 Pa. 343, 126 A. 766. It follows from this that Farquhar's statement with reference to the capitalization of the Plymouth Company was the mere naked assertion of fact, not amounting to a warranty, and, although untrue, afforded the plaintiff no cause of action. If it be true that the representations of Farquhar as to the capitalization of the company, though false, created no legal liability against him in favor of the plaintiff, then the transfer of the 50,000 shares would not rest on a good consideration. And, there being no legal liability or consideration to support the transfer, it would not appear that a court of equity could be successfully appealed to, to consummate the transfer by an extraordinary remedy equivalent to a mandatory injunction. Equity never grants such relief, except where the right is perfectly clear.

[6] But, aside from the question of civil liability, it may be said that the transfer was voluntarily made through the desire on the part of Farquhar to undo what he felt to be a wrong resulting to the plaintiff through his false representations, and that, the transfer being consummated, equity will not interfere to grant defendant relief against it. In no proper sense can it be said that the transaction was completed. According to the testimony of the plaintiff and his associates, Farquhar's agreement was not to transfer 50,000 shares, but to transfer something like 250,000 shares. Their position is that the 50,000 shares were transferred, not in consummation of the contract, but merely as an evidence of Farquhar's good faith that the contract would be carried out according to its terms, and the subsequent legal proceedings against him were because of his breach of contract in failure to deliver the stock in accordance with his agreement. It would appear, therefore, that the plaintiff is not in a position to allege that defendant has lost any legal or equitable right, which he might otherwise have had, to revoke the transfer on the ground that it was a fully consummated transaction.

In answer to the position that the transfer of the certificates for the 50,000 shares was voluntary, and by way of a general defense to the plaintiff's whole case, defendant Farquhar denies that the transfer was voluntary, alleging that it was made under circumstances amounting to duress; that he was compelled by threats of arrest, on charges of which he was innocent, to deliver the certificates in question, in order to avoid imprisonment, financial embarrassment, and disgrace to himself and family. This raises for decision questions of fact, and the law of duress applicable thereto.

Although the direct threats of arrest and imprisonment, to which Farquhar testified, are flatly denied by plaintiff and his associates, the actual situation confronting Farquhar at the time of the transfer of the 50,000 shares, and shortly subsequent thereto, during the period of negotiation for the transfer of the additional shares, is plainly apparent. During the year preceding June 23, 1925, no meeting either of directors or stockholders of the Plymouth Oil Company had been held. On that day, June 23d, at the office of the company and before the stockholders' meeting convened, the plaintiff claims to have learned for the first time, and that from Farquhar himself, the actual amount of the company's outstanding capital stock. It is alleged Farquhar said at that time that there had been a change in the capitalization of the company, and, in substance, agreed that plaintiff and his associates would secure the proportion of common stock necessary to give them the share in the total capital stock of the company which they had purchased, and which they had understood they held.

That there were negotiations and an arrangement between the parties for the trans-

fer, by Farquhar to the plaintiff and his associates, of about 250,000 shares, cannot be doubted. Farquhar testifies (page 53 of the record) that at the meeting at Henderson's office on June 25th he was charged by Henderson and Budd with having represented that there were only 350,000 shares of capital stock outstanding, and that they told him that, if he would tell his crowd that a criminal suit was about to be brought against him and them for a fraudulent issue of stock, that he would not have any trouble in getting the 250,000 shares. At the same time Farquhar stated: "In other words, they demanded 250,000 shares of stock, and asked me to go along with them, and uncover the whole thing, and have it all canceled. I told them it was absolutely impossible for me to get that much stock." It is clearly apparent from the whole testimony, at the various meetings between the parties from June 24th to July 9th, both inclusive, the subject of consideration and controversy was the transfer by Farquhar, to the plaintiff and his associates, of the large amount of stock above referred to, and that the transfer, on June 26th, of the certificates for the 50,000 shares in suit, was in part execution of Farquhar's agreement to convey.

Henderson testifies that, at the meeting on the 25th, the amount of stock held by Farquhar was discussed, and that, while the latter admitted that he had some 70,000 shares, he claimed that some of the stock was hypothecated, and that he had available only 50,000 shares. At the same time Henderson was asked whether Farquhar made any request for waiver of release of liability. Henderson replied that he had, Farquhar saying: "If I give you all the stock I have, will you release me from all responsibilities in the matter?" Henderson says: "We told him, 'No.'"

In this situation of uncertainty as to the outcome of the negotiations, an arrangement was made to meet on the following day, January 26th. From this attitude of the plaintiff and his associates, they must have had in mind proceedings, civil, criminal, or both, against Farquhar, in case of his failure to transfer to them the full amount of stock which they claimed. This is conclusively shown by the action which they took on that day. Henderson admits that, on June 25th, he, Lockhart, and Budd had no less than three meetings with their attorneys, at the second of which it was agreed to proceed against Farquhar criminally, and at the third of which definite steps were taken to prepare the information supporting the

warrants. On the morning of the 26th, Henderson, Lockhart, and Budd went to the alderman's office early and swore to the information upon which the warrants issued. There they met with their counsel, and together with Constable Magee went to Henderson's office, where Mr. Wilson also was present. The constable and Mr. Reed, counsel for the plaintiff, went into Mr. Wassum's room, which was a part of the Henderson suite.

When Farquhar arrived, he claims to have seen Magee standing near the back of the private hallway, near Mr. Wassum's room, and claims to have recognized him, because Magee had arrested his chauffeur some two months before. Whether Farquhar in fact saw and recognized Magee at that time is a matter of serious dispute in the testimony. It is the position of Farquhar that the discussion which followed finally resolved itself into a definite proposition of delivering 50,000 shares of stock or being arrested. He further testified that this was emphasized by Wilson, his intimate and special friend, who was left alone with Farquhar at least twice during the conference, and in which Wilson impressed upon him the necessity of producing the stock at once in order to avoid arrest. He testifies that Wilson said: "My God! Rome, you have got to do something; * * * the constable is here, you have got to do something quick." While this is denied by Wilson, it is confirmed by the latter's account of what occurred in Farquhar's office a little later, while Farquhar was signing the certificates of stock. Wilson testified: "Well, as he was handing me the certificates, he said: 'They can't do anything. I don't see why they won't give me more time, and not be so unreasonable. I just heard fifteen cases where there would be no liability, because there was no damage, no loss, no money lost.'" This would indicate that not only the time for action was fixed, but some urgent demand was made.

The plaintiffs denied generally that there were any threats of arrest, but that strong pressure was brought to bear on Farquhar appears from the fact that on that day Farquhar offered first 10,000 shares, and later 25,000 shares, both of which offers were rejected, and then agreed to give 50,000 shares, which plaintiff and his associates accepted as an evidence of good faith that his contract would be performed in full. Although the warrants for his arrest were out, and in the hands of the constable in an adjoining room, Farquhar was not arrested on that day, because the parties were content

to accept the 50,000 shares and extend to July 6th the time in which Farquhar would endeavor to obtain the balance of the 250,-000 shares.

That this was the situation is shown by the statement of Mr. Henderson that they were going to arrest Farquhar on the morning of the 26th if he didn't "come across." Whatever may have been Farquhar's mental attitude in the situation, it is perfectly clear that the conveyance of the 50,000 shares purchased for him temporary immunity from arrest on the 26th.

Farquhar was by no means a stranger to the idea of arresst and imprisonment in connection with this transaction. Lockhart testifies that on the morning of the 24th, as he and Farquhar were on their way to Pittsburgh, Farquhar discussed with him the possibility of going to the penitentiary. A. R. Budd testified that Farquhar talked of the possibility of going to jail at a meeting which he fixes as June 24th, and he also testifies that at one meeting Farquhar said "he had better keep his stock to defend himself." Wilson testifies that Farquhar discussed his criminal liability at one of the meetings, the date of which he could not fix. Wilson further says that at one of the meetings they asked Farquhar if he knew just what position he was in.

The witnesses for the plaintiff agree that, at the meeting on the 25th, the possibility of releasing Farquhar from all claims, civil and criminal, was discussed, and that he was told in substance that they would not release any rights whatever, even if he gave up all the stock he had. In view of this testimony, it is apparent that the possibility of criminal arrest and prosecution was distinctly in the minds of the plaintiff and his associates at their meeting on the 25th, and that that possibility was freely discussed among them.

When we consider the circumstances in which Farquhar was placed, with the possibility of arrest and imprisonment, of which he had spoken on several occasions, definitely in his mind, and that the proposition of releasing him from all liability, if he turned over all his stock, had been definitely rejected on the 25th, it is hard to conceive that on the next day he would have voluntarily tendered 50,000 shares of stock, worth on the market, at that time, perhaps $2,000,000, representing practically his entire fortune, merely through a feeling of remorse, and as an evidence of his good faith, in an effort to get 250,000 shares, worth $10,000,000, from persons who had no part in the misrepresentations complained of. We can scarcely conceive that this large amount of stock, of such great value, would have been given up without the pressure of threats of arrest, or without the proposal that immunity would be granted him in exchange.

On July 6th the parties met again at the expiration of the extended period; the plaintiff again having a constable in attendance. No purpose appears for the presence of the constable, other than to have him available in case Farquhar's attitude was not encouraging. No progress having been made by Farquhar towards obtaining the additional stock, the conference was adjourned to July 9th. Again the constable was present, as were also counsel for plaintiff and defendant. Plaintiff's counsel, Mr. Thorp, asked Judge Adams, defendant's counsel, what would happen if the message were conveyed to Mr. Benedum that criminal and civil proceedings were being commenced. The pressure which was applied by the plaintiff having failed as to procuring the remainder of the stock, Farquhar was put under arrest at the meeting of July 9th, and bail in $100,000 demanded, which the alderman reduced to $25,000, and a hearing was fixed for July 17th. Fearful lest Alderman Anderson should discharge Farquhar on July 16th, plaintiffs swore out similar informations in their attorney's office before Magistrate Blair, and directed that Farquhar be again arrested, in case Anderson refused to hold him. The alderman held Farquhar for the grand jury, apparently on the recommendation of the district attorney, that there might be technically a case of false pretense, but the grand jury, on hearing, ignored the bill.

In this situation the plaintiff, Henderson, with Lockhart and Budd, visited Senator Leslie to obtain his political influence, by bringing pressure to bear on the district attorney, so that an indictment would be returned by the November grand jury; they claiming that it had not been given proper consideration by that body. Senator Leslie testifies that he took the position that this was more in the nature of a civil than a criminal proceeding, and that the substance of their reply was that it was not necessary to send him to jail, that the indictment would be sufficient to bring him "across," and further that the indictment would have some effect, through publicity, on the pending chancery suit in Delaware.

District Attorney Gardner also testified that, between the two sessions of the grand jury, plaintiff's attorney had an interview with him, and that when the latter suggested that, because of the large sums of money

which the plaintiffs had made through Farquhar, a conviction would be impossible, plaintiff's counsel replied that they did not care whether the cases were ever tried, but that what they wanted was to get indictments, as it would aid them in their civil matters, referring to the equity case pending in Delaware. From all these facts, what conclusion is naturally forced upon the court? We are now considering the situation where no civil liability existed against Farquhar, and passing upon the question whether the transfer of the 50,000 shares in suit was voluntarily made through a desire on his part to undo what he felt to be a wrong, resulting to the plaintiff through Farquhar's false representations.

Farquhar, Henderson, Budd, and Wilson were friends, the friendship in the case of Wilson being very intimate. Farquhar, from whom they obtained the Plymouth Company stock, had been their benefactor. Aside from the representations as to the capital stock, his conduct toward them had been fair, and even generous. He had given them the opportunity to purchase large amounts of additional stock, at a very low figure, at a time when the property was largely developed, and the value of the stock had been greatly enhanced. When it was discovered, or at least called to his attention, that the Big Lake Oil Company was the owner of 25 per cent. of the stock, Farquhar insisted on turning over to the plaintiffs sufficient stock to fully make good the loss resulting from this misunderstanding or mistake. Farquhar was the trusted agent for the sale of the 150,000 shares of preferred stock, and seems to have kept faith with all parties as to the terms and conditions of sale. After extensive development of the property, and its demonstrated value, Farquhar gave an option to Henderson for 20,000 additional shares. The option was renewed, and expired before acceptance; but Henderson was allowed, after No. 9 well had come in, and the property was clearly of greater value, to accept the option as of that date.

It appears that Farquhar, who was the promoter of this marvelously successful oil enterprise, had retained only some 70,000 shares for his work and successful efforts. A part of this stock had been hypothecated, leaving available only 50,000 shares. If these passed under the assignment, so far as appears in the evidence, Farquhar's entire fortune, all the fruits of his efforts in promoting and developing the Plymouth Company will be taken away. In this situation,

particularly if no civil liability existed, it seems impossible to conclude that he would voluntarily, and without the pressure of duress, convey to the plaintiff and his associates all his remaining stock, when they had already been the beneficiaries of his efforts and generosity.

In connection with these facts, the procedure of the plaintiff and his associates has a double significance. Whether Farquhar was guilty of any criminal offense, under all the circumstances, is at least very doubtful. The great object which the plaintiffs had in mind was clearly not to prosecute him for a criminal offense in the interest of the public order, but to use the process of the criminal law to compel a settlement in a civil matter, which they feared otherwise they could not obtain. Criminal proceedings are instituted, warrants issued, and constables on hand ready to make an arrest, if the adjustment did not materialize or was not satisfactory. Farquhar's mind was evidently filled with the fear of arrest and imprisonment, and the resulting disgrace to his family, during the three weeks when the various meetings were held and the question of the transfer of the stock was the subject of consideration. It is admitted that they intended to arrest him if he did not comply with his agreement, and when failure became evident he was arrested, and excessive bail demanded. On the same day, after the transfer of the certificates for 50,000 shares, Farquhar by letter repudiated the transfer on the ground of duress and fraud, and demanded the return of the stock. [7] It remains only to apply to the facts of the case the law of duress. It cannot be doubted that a court of equity will rescind a transaction which was compelled by express threats of immediate arrest, where the threatened party feared the imminency of the imprisonment with which he was threatened, and the transfer thus made would not have been made voluntarily without such coercion. Such threats need not be of an unlawful imprisonment; that is, that the person threatened must be innocent of the charge. If there is a threatened arrest for an improper purpose, without just cause, or an arrest for a just cause, but without lawful authority, or for an unlawful purpose, in any of these cases, where a contract is induced which would otherwise not have been made, it may be avoided as a contract procured by duress. Baker v. Morton, 79 U. S. (12 Wall.) 150–158, 20 L. Ed. 262.

In Fountain v. Bigham, 235 Pa. 35, 84 A. 131, Ann. Cas. 1913D, 1185, the defense to a

suit on a bond was that the bond was executed under the influence of threats and coercion. The trial court was reversed, because of its rejection of testimony relating to threats which had been made upon the defendant to prosecute his son-in-law, on the ground that it was not coercive upon the defendant. In reversing for this error the Supreme Court said: "In other words, a threat of lawful imprisonment is not duress, unless it is made for an unlawful purpose, such, for instance, as compelling the satisfaction of a debt by payment in money or by the execution of an obligation to secure it. If, in connection with the threat, it appears that the creditor declared he would prosecute if the claim was not paid, with other evidence showing that his intention was to use the criminal process to collect the debt, or to accomplish any unlawful purpose, a jury might well find that such was the purpose of the creditor in making the threat, and that therefore it was duress."

[8] It may be stated as an established rule that any contract produced by actual intimidation is voidable, not only where the circumstances were sufficient to intimidate a man of ordinary firmness but was sufficient to, and did, intimidate the particular person who was the subject of the coercion. It is also true that criminal proceedings may be regular, on a charge for which there is probable cause, and yet, if the arrest is made for the purpose of extortion, for the purpose of compelling the doing of that which otherwise would not have been done, duress exists, and the contract is voidable. Fillman v. Ryan, 168 Pa. 484, 32 A. 89; Avery v. Layton, 119 Pa. 604, 13 A. 528. It is said in Hackett v. King, 6 Allen (Mass.) 58: "Though a person is arrested under a legal warrant and by a proper officer, yet if one of the objects of the arrest is thereby to extort money, or enforce the settlement of a civil claim, such arrest is a false imprisonment by all who have directly or indirectly procured the same, or participated therein, for any such purpose; and a release or conveyance of property obtained by means of such arrest is void."

[9] Broadly stated, the law will not tolerate the employment of criminal process for the enforcement of a civil liability. Fillman v. Ryan, supra. In International Harvester Co. v. Voboril, 187 F. 973, 110 C. C. A. 311, it was held that duress may be caused by threats of criminal prosecution of husband, wife, children, or other near relative, though no crime has in fact been committed or prosecution begun. If the contracting party has been so put in fear as to be deprived of the free will power essential to contractual capacity, the transaction may be avoided. In Galusha v. Sherman, 105 Wis. 263, 81 N. W. 495, 47 L. R. A. 417, the subject of duress is elaborately considered. The able opinion of Judge Marshall is epitomized in these words: "The material, and only material, question being: Was the threat made for the purpose of overcoming the will of the person threatened, and did it have that effect, and was the contract thereby obtained?" In Severance v. Kimball, 8 N. H. 386, it was held that, where there is an arrest for a just cause and under lawful authority, for unlawful purposes, it may be considered a duress.

Many other cases might be cited to the same general effect. Even if the record does not support a finding of express threats, if the transfer of the stock in this case was induced by actual intimidation or fear, duress exists. The test is not the manner in which the pressure is exerted, but the effect upon the mind of the threatened party. In Fountain v. Bigham, 235 Pa. 35, 84 A. 131, Ann. Cas. 1913D, 1185, a leading case, it is said: "The test of duress is not so much the means by which the party was compelled to execute the contract as it is the state of mind induced by the means employed—the fear which made it impossible for him to exercise his own free will." In Cochrane v. Nelson, 45 S. D. 609, 189 N. W. 700, the court said: "Coercion may be accomplished by a set of circumstances brought about by designing persons as effectually and as wrongfully as it may be accomplished by direct threats and menace."

[10] From all the facts and circumstances of the case, I find that the transfer by Farquhar to the plaintiff of the certificates for 50,000 shares of stock was obtained through duress and coercion, compelled by the fear of arrest and imprisonment, with the resulting financial embarrassment and public disgrace, and that this result followed equally, whether there were express threats of immediate arrest, or from all the attendant circumstances, which created in the mind of Farquhar a fear that, unless he met the demands of the plaintiff, his arrest would follow. In other words, the test of existing duress is not so much the use of words as the existence of facts and circumstances creating the fear of arrest.

In this case both Farquhar and Henderson are before a court of equity, seeking affirmative relief. If it be said that the transaction is tainted with illegality, because it arose upon an offer to suppress a prosecution, and an acceptance upon that basis, and that into such

transaction a court of equity will hesitate to inquire, the answer is that the charges are not felonies, but misdemeanors. And, even were it a felony, the maxim "in pari delicto" does not apply, as the transaction compounding it was compelled by duress. It was said in Bryant v. Peck & Whipple Co., 154 Mass. 460, 28 N. E. 678, in an opinion by Justice Holmes:

"According to the allegations of the bill, the plaintiff became a party to the note from which he prays to be relieved, and transferred his stock, in consideration that the defendant would not prosecute his son for perjury, and under a threat from it that otherwise his son would be prosecuted. The transaction was illegal (Pub. St. c. 205, § 27; Gorham v. Keyes, 137 Mass. 583), and, if the parties stood on an equal footing, neither of them would have a remedy against the other (Atwood v. Fisk, 101 Mass. 363 [100 Am. Dec. 124]). But it is well recognized that, although both parties are chargeable with knowledge that their agreement is contrary to some rule of law, yet if one of them acts under duress, or what the law regards as undue influence on the part of the other, they do not stand on an equal footing, and the weaker one may be granted affirmative relief."

It follows that the plaintiff's bill should be dismissed, and that the intervening defendant, Farquhar, is entitled to a redelivery of the certificates for the 50,000 shares of stock in suit, and to a payment of the dividends which have been declared thereon and remain unpaid, with costs to the defendants. A decree may be drawn accordingly.